T.C. Memo. 2002-162

UNITED STATES TAX COURT

LUCIAN T. BALDWIN, III, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

LUCIAN T. BALDWIN, III AND TERESA M. BALDWIN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 18739-95, 24410-95.    Filed June 26, 2002.

<u>Arnold A. Pagniucci</u>, <u>Paul D. Carman</u>, <u>Steven A. Miller</u>,

<u>Austin L. Hirsch</u>, and <u>Henry Pietrkowski</u>, for petitioner Lucian T.

Baldwin III.

<u>John J. Morrison</u>, for petitioner Teresa M. Baldwin.

<u>Marjory A. Gilbert</u>, <u>Catherine Thayer</u>, and <u>Claire McKenzie</u>,

for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, Judge:  In these consolidated cases, respondent determined the following deficiencies, additions to tax, and penalties in petitioners' Federal income taxes:

Docket No. 24410-95
Lucian T. Baldwin III and Teresa M. Baldwin:

| Year | Deficiency | Additions to tax | | Accuracy-related penalty |
| | | Sec. 6653(a)(1) | Sec. 6661 | Sec. 6662(a) |
| --- | --- | --- | --- | --- |
| 1988 | $418,914 | $20,946 | $104,729 | --- |
| 1989 | 441,563 | — | --- | $88,313 |

Docket No. 18739-95
Lucian T. Baldwin III:

| Year | Deficiency | Accuracy-related penalty Sec. 6662(a) |
| --- | --- | --- |
| 1990 | $660,180 | $132,036 |
| 1991 | 627,605 | 125,521 |
| 1992 | 331,541 | 66,308 |

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Monetary amounts are rounded to the nearest dollar.

After concessions,[1] the issues for decision are:

_____

[1]Respondent has conceded that petitioner Teresa M. Baldwin (Mrs. Baldwin) qualifies for relief from joint liability under sec. 6015.  Other assignments of error raised in the petitions and not addressed in the stipulations of settled issues or on brief are deemed conceded.  See Rule 151(e)(4) and (5); Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989); Money v. Commissioner,
(continued...)

(1)  Whether Loma Farms, Inc. (LFI), an S corporation owned by petitioner Lucian T. Baldwin III (petitioner) that purportedly owned and managed a 5,000-acre lakefront lodge property known as Granot Loma, operated a trade or business within the meaning of section 162 or conducted an activity "not engaged in for profit" within the meaning of section 183;

(2) whether the duty of consistency or the doctrine of equitable estoppel applies to bar petitioner's contention that Baldwin Aircraft Corp. (BAC) was not a valid S corporation during the years at issue;

(3) if the duty of consistency or the doctrine of equitable estoppel applies to bar petitioner's contention, whether BAC operated a trade or business within the meaning of section 162, or whether BAC conducted an activity "not engaged in for profit" within the meaning of section 183;

(4) whether deductions for lodging and travel expenses claimed by Baldwin Commodities Corp. (BCC), for 1990, 1991, and 1992, are allowable under sections 162 and 274; and

(5) whether petitioner is liable for the additions to tax and penalties determined by respondent.

---

[1](...continued)
89 T.C. 46, 48 (1987).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and supplemental stipulations of facts are incorporated in this opinion by this reference.

Background

At the time the petitions in these cases were filed, petitioners, who were married to each other during the years at issue, were no longer married and resided separately in Winnetka, Illinois.

Petitioner received his bachelor of science degree from Santa Clara University. He subsequently obtained a master of business administration degree with emphasis in agribusiness. Petitioner also attended law school for two semesters on a part-time basis.

Petitioners were married in 1978. They have three children: Christina, Jane, and Lucian, born in 1982, 1986, and 1987, respectively. In September of 1990, petitioners separated, and in late 1990, a petition for divorce was filed. In 1993, following a hotly contested trial involving multiple issues concerning the ownership of property, a judgment of dissolution was entered, and petitioners' divorce became final.

Petitioner's Bond Trading Activities and Other Business Ventures

Petitioner has been a bond trader at the Chicago Board of Trade since 1982. From 1987 through 1989, petitioner traded as a

sole proprietor under the name of Baldwin Commodities (BC). In 1990, petitioner incorporated the proprietorship and became sole shareholder of BCC, an S corporation.

During the years at issue, petitioner was a very successful trader in the bond pit at the Chicago Board of Trade. Petitioner's success was due, at least in part, to his financial resources, reputation, and relationships with brokers and other traders in the bond pit. His financial resources enabled him to trade with brokers representing institutional clients and other traders with large volume orders.

In 1987, petitioner earned $19,160,059 from his bond trading activity. During the years at issue, the amount of time petitioner spent in the bond pit decreased as a result of his marital problems and the divorce litigation, as well as health problems that followed a plane crash in November 1991. Petitioner's income from bond trading during the years at issue was as follows:

| Year | Income |
|------|--------|
| 1988 | $7,254,066 |
| 1989 | 4,570,760 |
| 1990 | 5,269,504 |
| 1991 | 4,134,403 |
| 1992 | 3,045,776 |

During the years at issue, petitioner began to diversify his business and investment interests and formed several new companies. For example, in December 1988, petitioner purchased

the Rookery Building on LaSalle Street in Chicago and formed two real estate companies, Baldwin Development Corp. (BDC) and Baldwin Asset Management Co. (BAMCo.), to restore and manage the Rookery Building.  In May 1989, petitioner incorporated Baldwin Financial Corp. (BFC).  BFC was registered with the Commodity Futures Trading Commission as a commodity pool operator and a commodity trading adviser.  In 1992, petitioner formed a New York general partnership named MC Baldwin Financial to continue BFC's business as a commodity pool operator and commodity trading adviser.

Granot Loma

During 1986 and 1987, petitioners looked sporadically for a vacation home.  Petitioner first learned of the existence of Granot Loma in 1987.  During a family vacation in 1987, petitioners, accompanied by their children and Mrs. Baldwin's brother, Pat Matre, and his family, drove to see the property.

Granot Loma consisted of approximately 5,000 acres, including 4 miles of Lake Superior shoreline.  There were two complexes of buildings at Granot Loma, the large log cabin lodge with its associated outbuildings and the old farm complex.  A separate small log cabin which was the original depot for the railroad spur that once serviced the property was also located on the property.

The lodge complex was located on Lake Superior and consisted of the large log cabin lodge, a garage, a child's playhouse, a separate building called the maid's quarters, a carriage house, and a guest house. The lodge at Granot Loma had 22 bedrooms arranged in 10 suites. Because the lodge was sited on a small peninsula, many of the lodge's rooms faced Lake Superior.[2]

The old farm complex was located down the road from the lodge complex and consisted of a farmhouse, a caretaker's house, a barn, a piggery, a manure house, a slaughterhouse, a creamery which had been converted to a pool house prior to 1987, and a pheasant/pigeon house. The farmhouse and the caretaker's house were both habitable residences in 1987. The garage, pool house, and depot were the only other buildings in usable condition in 1987. The remaining buildings were all in need of substantial repairs, renovation, and cleaning.

The area around Granot Loma was essentially a wilderness area. The property was forested and contains mature stands of hemlock, maple, pine, birch, cedar, spruce, and poplar. Included in its acreage was over a mile of frontage on the Little Garlic

---

[2]The lodge was built in the 1920s by financier Lewis Kaufman in the style of an Adirondack camp. Visitors during the 1920s and 1930s included Governor Al Smith, actress Mary Pickford, and the pianist and composer George Gershwin. The deal to build the Empire State Building was finalized at Granot Loma. By 1987, however, when petitioner purchased Granot Loma, the grand days of Granot Loma were long over; no one had lived in the lodge for decades.

River, considered to have some of the finest rainbow trout fishing in the State of Michigan.

Since at least November 1992, Granot Loma's frontage area has been zoned for recreational structures, the farm area has been zoned for rural residential, another area has been zoned for resource production, and the remaining acreage has been zoned for timber production.[3]

## Petitioners' Acquisition of Granot Loma

When petitioners' family and the Matre family first visited Granot Loma in 1987, the two families toured the property with caretaker George Johnson. During the tour, petitioner, Mrs. Matre, and Mr. Johnson discussed numerous issues, including the history and use of Granot Loma, other potential buyers of the property, and potential business uses of the property, such as for a corporate retreat. Mr. Johnson also suggested selective logging of the valuable maple trees that grew on the property, as well as other ventures, such as a hunting club that could take advantage of the property's natural resources.

When petitioner first viewed the lodge, he thought the property could be restored to its former grandeur. Within a few days of their first visit, petitioners decided to purchase Granot Loma, and the transaction closed on October 1, 1987. Petitioners

---

[3]The record does not reflect the types of activities that would have been allowed by local zoning laws as of the time of purchase, or how they changed, if at all, through November 1992.

paid $4,380,000 for Granot Loma and took title to the property as tenants by the entireties.[4]

Around the time of Granot Loma's purchase, petitioner discussed with Eugene Portman, an attorney who specialized in real estate law, the creation of several corporate entities to house several new businesses and investments petitioner was acquiring in an attempt to diversify his assets.  Mr. Portman handled Granot Loma's closing and associated preclosing matters for petitioner.

On April 14, 1988, Mr. Portman filed articles of incorporation with the Illinois secretary of state for a company that was later renamed Loma Farms, Inc. (LFI).  The articles stated that the company was formed for the purpose of "engaging in the business of * * * property manager and convention, hotel and resort manager."  Petitioner was LFI's sole shareholder.

Petitioner's Restoration of Granot Loma

Petitioner engaged Mr. Matre as his general contractor for the restoration of Granot Loma.  In exchange for Mr. Matre's services, petitioner promised him 10 percent of any profit upon the sale of Granot Loma and free use of the property when space was available.

---

[4]This amount includes $125,000 paid to George and Carmen Johnson to purchase the depot property.

Because petitioner thought he might use Granot Loma as a lodge or corporate retreat at some point, his plan for the restoration included commercial amenities. For example, petitioner renovated and equipped the kitchen so that up to 150 guests could be accommodated. Petitioner installed a commercial bar system which dispensed metered shots of liquor and soda through hoses from a basement storage area. Furthermore, heating, electrical, and other major systems were all built to withstand and support commercial use.

In many other respects, however, Granot Loma's restoration also reflected petitioners' intent to use it as a personal residence for their immediate and extended family, their friends, and other invited guests. For example, although the renovation of the kitchen included the installation of commercial grade equipment and systems, the kitchen was designed so that it easily could be used by petitioners and their family and friends when they visited Granot Loma. Petitioners' renovation of the kitchen included a greenhouse addition which was used as a family dining area. When Mrs. Baldwin decorated the lodge with help from an interior decorator, she decorated the lodge to be her family home. Thus, the second floor of the lodge housed a nursery, a children's play area, a media room, a home office, and a master bedroom for petitioners, along with several other bedrooms used

for petitioner's children, Mr. Matre and his family, and other regular guests.

Renovation of the lodge began in the spring of 1988 and was substantially completed by the end of that year. The lodge, however, was not habitable until March 1989 when furniture was first moved into the lodge. During the renovation period, petitioner and his family visited on a weekly or biweekly basis so that petitioner could supervise the contractors and his family could enjoy the property. Until the lodge was habitable, petitioner's family and Mr. Matre's family stayed in the farmhouse.

The cost of capital improvements to Granot Loma from October 1, 1987, through December 31, 1992, totaled $2,504,794.

Petitioners' Use of Granot Loma

Before acquiring Granot Loma, petitioners took vacations to various locations around the world, including long trips on holidays. From the date they acquired Granot Loma through August 1990, petitioners spent almost every holiday at Granot Loma.

During the years at issue, petitioners and their family personally used Granot Loma as follows:

| Year | Days Used |
|------|-----------|
| 1988 | 68 |
| 1989 | 79 |
| 1990 | 71 |
| 1991 | 66 |
| 1992 | 51 |

Granot Loma's most frequent visitors were petitioners, their children, and other family members. Other visitors during the years at issue included personal friends, business associates, and pilots. On several occasions, petitioners' extended families joined them at Granot Loma.

While at Granot Loma, petitioners and their guests participated in recreational activities such as riding all-terrain vehicles (ATVs), snowmobiling, skiing, hunting, boating, and fishing. Petitioners kept two small ATVs at Granot Loma for their children to ride, and three to four full-size ATVs. Petitioners also kept snowmobiles at Granot Loma. When petitioners first purchased Granot Loma, their children were young; the children played, swam, rode on ATVs and snowmobiles, and otherwise participated in normal childhood activities. Petitioner participated in many activities with his children, and, even on days when petitioner was out hunting or fishing, the family ate meals together and played together in the evenings.

Petitioners' children left toys, bicycles, and clothing at Granot Loma when they returned to Winnetka. Petitioners used the master suite at Granot Loma as their bedroom and office until they separated. Mrs. Baldwin left her personal belongings in the master bedroom when she returned to Winnetka. After his separation from Mrs. Baldwin in 1990, petitioner spent many weekends and holidays with his children at Granot Loma.

Throughout the years at issue, petitioner insured Granot Loma as his second residence.  Petitioner also insured all the recreational vehicles at Granot Loma; i.e., boats, personal watercraft, and snowmobiles, as his personal property.

Petitioner occasionally discussed investments or other business matters while at Granot Loma.  Petitioner also entertained family members and friends with whom he did business, as well as employees, traders, brokers, and other business associates, at such events as annual employee weekends and trader weekends.

From time to time, petitioner investigated possible business uses for Granot Loma.  For example, in 1989, petitioner decided to plant Christmas trees on the property.[5]  Also, in 1989, following a vicious winter storm, petitioner engaged a logging company to remove some storm-damaged trees.  Sometime later, petitioner hired a contractor to conduct a selective timber harvesting program on a limited trial basis.  In approximately

---

[5]The Marquette County Soil and Water Conservation District was consulted to determine the optimum locations for planting the trees.  Petitioner rejected the Conservation District's first choice for siting the trees, as he wanted to keep that field available for a runway.  Petitioner ultimately decided to plant the Christmas trees along the driveway, a site not recommended by the Conservation District.  In the year following their planting, approximately one-half of the newly planted trees died because their roots had not been clipped prior to planting.  The burden of digging up the dead trees and replanting was deemed to exceed any expected benefit, so the Christmas tree operation was abandoned.  None of the Christmas trees planted at Granot Loma ever generated any income.

1990, Granot Loma's caretaker and his wife experimented with some maple syrup equipment they found on the property to tap some of the maple trees growing on the property and process the sap into syrup. They ceased the experiment, however, after the caretaker's wife received burns as a result of their activity.

In February 1989, petitioner hired Joseph Ketter as caretaker and property manager for Granot Loma. When Mr. Ketter was hired, he was informed that petitioner intended to use Granot Loma as a business retreat. At some point after he was hired, Mr. Ketter was instructed to issue an invoice in LFI's name to one of petitioner's other corporations each time petitioners, a member of their family, or one of their friends, business associates, or guests visited Granot Loma. For example, the first invoice for $420, dated March 7, 1989, was addressed to BAC and covered three nights for two pilots at a rate of $70 per person per night. Another invoice, dated August 9, 1989, for $5,530 was addressed to BCC, reflecting the overnight stays of petitioner's employees during the 1989 employee weekend, at the same rate. One invoice for $123,285, dated April 23, 1990,[6] was addressed to BCC and retroactively billed BCC for visits by petitioner, his family, and their guests during 1988, 1989, and

---

[6]Petitioner's accountant, Mr. DiMaggio, was first contacted by a representative of the Internal Revenue Service regarding the examination at issue in this case in April 1990.

the early part of 1990.  From March 1990 through the end of 1992,
LFI billed BCC for every night petitioner, a member of his
family, one of his business acquaintances, or one of his friends
stayed at Granot Loma.

LFI did not bill any of the guests directly; all invoices
were sent either to BCC, BDC, or BAC.  In fact, almost none of
the guests were even aware that LFI was charging anyone for their
stay.  Even Mrs. Baldwin was not aware of LFI's invoicing system
until the divorce proceedings commenced.

No rooms at Granot Loma were ever held out to the public for
rent, and no rooms were ever rented to the public.[7]  No leases or
rental contracts for the rental of Granot Loma were executed by
LFI, any guest, or any of petitioner's other companies.  Only
petitioner's relatives, friends, business acquaintances, and
other invited guests used Granot Loma.  In fact, petitioners
decided not to operate Granot Loma as a commercial lodge because
they did not want to curtail their use of the facility or to open
it up for use by guests they had not invited personally.

When Mr. Ketter set the rental rates for Granot Loma, he did
not estimate an occupancy rate, project the frequency of use, or

---

[7]In September 1989, Worth Brown, a resort manager, visited
Granot Loma for the purpose of determining whether Granot Loma
could be operated as a luxury resort.  He concluded that it was
possible.  Petitioners, however, decided not to commence a bed
and breakfast or other business open to the public because they
did not want to share the lodge with outsiders.  Granot Loma was
never operated as a commercial lodge.

conduct any market studies. The initial per-night rate of $70 per person purportedly covered lodging and meals and did not vary by room. Mr. Ketter increased the per-night rate to $125 per person in August 1989, to $175 per person on January 1, 1991, and to $200 per person on January 1, 1992. Visitors to Granot Loma enjoyed, for no additional charge, the Disney channel and other entertainment channels, babysitters, shotgun shells, archery targets and arrows, dry cleaning, and a variety of other items of a personal nature.

All of LFI's purported rental income came from BCC and other companies owned or controlled by petitioner. The income, however, was insufficient to cover LFI's alleged expenses. LFI's cashflow deficits were funded through a shareholder's loan account, thus ensuring that Granot Loma had adequate cashflow to cover expenses. BCC paid some of LFI's invoices by intercompany account transfers; others were paid by reducing LFI's indebtedness to BCC.

In the summer of 1990, petitioners held an auction to sell off furniture and rugs at the lodge that had not been used in the restoration. The auction raised a total of $309,386. The net proceeds were applied to reduce LFI's debt to BCC.[8]

---

[8]In a stipulation of settled issues, the parties agreed that petitioner had additional capital gains of $261,889 arising from the auction sale and that the auction sale proceeds were not ordinary income to LFI.

Petitioner's Attempt To Sell Granot Loma

In 1989, petitioner decided to sell Granot Loma. His decision to do so was influenced by his marital problems and a 1-day trading loss of approximately $5 million. In early 1990, Gary Walker, an appraiser, valued the property in excess of $10 million. On April 30, 1990, after discussions and negotiations with several real estate brokers, petitioner listed Granot Loma with a broker for an asking price of $12 million. Although the property generated considerable interest, no reasonable offers were received. Petitioner renewed the listing once and then allowed it to expire during 1991.

On his financial statement dated May 31, 1992, petitioner reported the value of his interest in LFI as $4,551,888. During the pendency of his divorce, petitioner obtained an appraisal of Granot Loma that valued the fee simple interest in the property, as of July 28, 1992, at $3,800,000. That appraisal identified petitioners as the owners of Granot Loma.

BAC

On May 20, 1988, petitioner purchased a Beechcraft King Air 200 (King Air) and formed BAC to own and operate the King Air. Articles of incorporation for BAC were prepared and filed in North Carolina the same day. On August 24, 1988, BAC traded its King Air for a Sabreliner jet (the Sabre). Petitioner hired professional pilots to fly the Sabre.

BAC's S Election

Mr. Portman recommended that BAC be owned by Mrs. Baldwin in order to protect petitioner's trading business from liability in the event of an accident and informed petitioner's accountant that Mrs. Baldwin would own BAC. Mr. Portman prepared BAC's Form 2553, Election by a Small Business Corporation (Under section 1362 of the Internal Revenue Code), and sent the Form 2553 to petitioner with instructions for Mrs. Baldwin to sign as sole shareholder. However, Mrs. Baldwin did not sign the form and did not consent to BAC's election to be treated as an S corporation. Instead, Liz Matre signed Mrs. Baldwin's name (as consenting shareholder and as president of BAC) on the form. Respondent accepted the facially complete Form 2553 on May 31, 1988.

BAC's 1988 and 1989 Forms 1120S, U.S. Income Tax Return for an S Corporation, list Mrs. Baldwin as BAC's sole shareholder. BAC's 1990, 1991, and 1992 Forms 1120S, which were filed after petitioners' divorce proceeding had commenced, list petitioner as BAC's sole shareholder.

BAC's Transportation Activity

During the years at issue, petitioner regularly used the Sabre to transport himself and his family, friends, and other invited guests to Granot Loma. In an effort to structure the operation of BAC as a business, petitioner, beginning in approximately May 1989, arranged for BAC to invoice one of his

other companies each time the Sabre was used. From 1989 through and including 1992, BAC billed one of petitioner's companies for each person transported, using a per capita rate established by BAC's president after consultation with petitioner.[9] The per capita rate used to prepare the invoices was increased in 1989, 1990, and 1991 in an effort to reduce BAC's substantial operating losses.

BAC claimed depreciation on the Sabre, which was titled in BAC's name, and on a Cessna, which was not titled in BAC's name.[10] Petitioner acquired the Cessna ostensibly so that he could obtain his pilot's license and eventually fly the Sabre.

During the years at issue, BAC did not offer the Sabre for charter by third parties, nor did it lease the Sabre to a third party; BAC used the Sabre to provide transportation exclusively to petitioners, their family, and invited guests.

---

[9]After November 1990, BAC did not include passenger names other than petitioner's in the aircraft utilization reports and trip recaps maintained by BAC. In addition, BAC did not maintain any records regarding the nature of the trips taken on its aircraft.

[10]Record title to the Cessna was apparently held by a separate corporation, Lucian Aircraft Co., which insured the Cessna until 1991. Petitioner's accountant testified that BAC claimed depreciation on the Cessna because BAC should have owned the Cessna. Certain records in evidence show that the Cessna was rented on three occasions during 1990 by people who were or had been employed as BAC's pilots.

Tax Reporting

LFI

On a Schedule F, Farm Income and Expenses, attached to petitioners' 1987 Federal income tax return Form 1040, petitioners represented that Granot Loma was a Christmas tree farm and claimed a depreciation deduction of $163,781 with respect to personal property with a book value of $1 million and improvements with a book value of $2,255,000.

On LFI's Forms 1120S for 1988 through 1992, LFI reported the following income, expenses, and net operating losses:

|  | 1988 | 1989 | 1990 | 1991 | 1992 |
|---|---|---|---|---|---|
| Income: |  |  |  |  |  |
| Lodging | -0- | $16,290 | $233,285 | $154,373 | $124,148 |
| Tree removal |  | 8,135 |  |  |  |
| Auction |  |  | 305,567 |  |  |
| Less: Refunds |  | (1,414) |  |  |  |
| Other income |  | 2,936 | 6,024 |  | 3,000 |
| Total income | -0- | 25,947 | 544,876 | 154,373 | 127,148 |
| Expenses: |  |  |  |  |  |
| Salaries & wages | $284,437 | 144,996 | 89,153 | 80,192 | 33,908 |
| Repairs |  | 14,225 |  | 30,771 | 12,758 |
| Bad debts |  |  |  | 9,958 |  |
| Rents |  |  | 2,000 |  | 2,856 |
| Taxes |  | 71,134 | 139,297 | 58,494 | 80,155 |
| Depreciation | 307,422 | 379,204 | 363,126 | 314,419 | 275,043 |
| Employee benefits |  | 11,084 |  | 21,732 | 6,839 |
| Other expenses | 375,147 | 301,289 | 403,580 | 239,342 | 176,417 |
| Total expenses | 967,006 | 921,932 | 997,156 | 754,908 | 587,976 |
| Net income or (loss) | (967,006) | (895,985) | (452,280) | (600,535) | (460,828) |

BAC

On BAC's Forms 1120S for 1988 through 1992, BAC reported the following income, expenses, and net operating losses:

| | 1988 | 1989 | 1990 | 1991 | 1992 |
|---|---|---|---|---|---|
| Income: | | | | | |
| Rental income | $168,400 | $179,406 | $109,185 | $221,563 | $200,390 |
| Other income | | 16,148 | | | |
| Total income | 168,400 | 195,554 | 109,185 | 221,563 | 200,390 |
| Expenses: | | | | | |
| Salaries & wages | | 31,778 | 48,627 | 40,260 | 40,000 |
| Repairs | | 87,433 | | | |
| Rents (Hangar) | 7,618 | 12,345 | 16,208 | 18,310 | 17,826 |
| Taxes | | 18,694 | 4,561 | 3,166 | 3,612 |
| Depreciation | 86,502 | 322,667 | 194,240 | 116,583 | 108,057 |
| Employee benefits | | 4,408 | | 108 | |
| Other expenses | 269,890 | 169,331 | 374,463 | 424,697 | 316,743 |
| Total expenses | 364,010 | 646,656 | 638,099 | 603,124 | 486,238 |
| Net income or (loss) | (195,610) | (451,102) | (528,914) | (381,561) | (285,848) |

## Accountant's Role

Throughout the years at issue, petitioner utilized the services of Victor DiMaggio, a certified public accountant. Mr. DiMaggio provided consulting services to petitioner with respect to LFI and BAC, prepared LFI's, BAC's, BCC's, and petitioners' tax returns, and helped LFI's and BAC's employees set up and maintain the books and records for those companies. Mr. DiMaggio also advised petitioner individually regarding some tax matters. Petitioner instructed his employees to contact Mr. DiMaggio directly whenever they had any tax-related questions.

At some point before he prepared petitioner's 1989 return, Mr. DiMaggio warned petitioner that LFI and BAC may be activities not engaged in for profit and that, therefore, the losses attributable to those activities may be disallowed under section 183. In addition, in the course of preparing BCC's tax returns for the years at issue, Mr. DiMaggio estimated that a substantial portion of the amounts billed to BCC by LFI and BAC for 1990, 1991, and 1992 were attributable to petitioner's personal use of

Granot Loma and the aircraft.  Specifically, Mr. DiMaggio estimated that 90 percent of the amounts billed in 1990 and 75 percent in 1991 and 1992 by LFI and BAC were attributable to petitioner's personal use of Granot Loma and the aircraft.

The Audit and Notices of Deficiency

In April 1990, Mr. DiMaggio was first contacted about the audit of petitioners' returns.  In September 1990, Jean Witek, the revenue agent assigned to audit petitioners' returns, sent the initial audit letter to petitioners.

In 1991, during the pendency of petitioners' divorce case, counsel for Mr. and Mrs. Baldwin argued in court about which party owned BAC (the ownership dispute).  Mr. DiMaggio claimed that Ms. Witek observed these arguments and subsequently referred to the ownership dispute in conversations with him.[11]

The audit eventually was completed without any change to BAC's S corporation status.  During the appeals process, Mr. DiMaggio never mentioned the ownership dispute, nor did he raise any issues concerning the validity of BAC's S election with any of respondent's Appeals officers or other agents.  The protest documents filed by Mr. DiMaggio represented, indirectly, that BAC was a valid S corporation; i.e., he maintained that petitioners were entitled to deduct BAC's passthrough losses.

---

[11]According to Mr. DiMaggio, he and Ms. Witek agreed to defer consideration of the ownership dispute until the end of the audit.  Unfortunately, Ms. Witek was unable to complete the audit because of illness.

Respondent proposed numerous adjustments in the notices of deficiency, most of which have been resolved. For each year at issue with respect to BAC, respondent disallowed all of BAC's expenses and recalculated BAC's income accordingly, determined that petitioner must include in his income BAC's corrected S corporation income, and allowed petitioner additional Schedule A miscellaneous deductions in amounts equal to BAC's corrected S corporation income, presumably pursuant to section 183(b).[12] For 1988, 1991, and 1992 with respect to LFI, respondent disallowed petitioner's deductions of LFI's distributive net losses. For 1989, respondent disallowed all of LFI's deductions and determined that petitioner must include in income LFI's corrected S corporation income but did not make any adjustment under section 183(b) except with respect to Granot Loma's real estate taxes. For 1990, respondent reclassified LFI's net auction proceeds as capital gain to petitioner, disallowed all of LFI's deductions, and determined that petitioner must include in income LFI's corrected S corporation income but did not make any adjustment under section 183(b) except with respect to Granot Loma's real estate taxes.

---

[12]By disallowing petitioner's deductions of BAC's losses, respondent effectively allowed petitioner the adjustment required by sec. 183(b).

OPINION

I.  LFI Issues

In a far-ranging and sometimes unfocused attack on LFI, respondent, in his notices of deficiency, asserted numerous grounds for disallowing LFI's deductions and recalculating LFI's distributive net income for the years at issue:  (1) Petitioner has not established the amounts in question were paid or incurred in a trade or business; (2) Granot Loma was never transferred to LFI by petitioners and, therefore, LFI is not entitled to depreciate Granot Loma; (3) petitioner has not established that he was at risk with respect to LFI; (4) petitioner has not established that "the activity" was entered into for profit; (5) petitioner has not established that "the transaction" had economic substance; (6) petitioner has not established that the claimed losses were incurred or were otherwise allowable; and (7) petitioner has not established that "the amounts claimed as payments were paid, and if paid, were for the purpose as stated."

Although the parties devoted most of their arguments on brief to the issue of whether LFI was a trade or business under section 162 or an activity not engaged in for profit within the meaning of section 183, the parties also addressed the other grounds raised in the notices of deficiency as well as an additional argument under section 280A that was not enumerated in, or expressly raised by, the notices of deficiency.  Because we believe that the issue regarding the proper tax treatment of

LFI's income, deductions, and losses may be appropriately resolved by applying sections 162 and 183, we direct our analysis accordingly.

A.   Sections 162 and 183

Under section 162, a taxpayer may deduct the ordinary and necessary expenses paid or incurred during the taxable year in carrying on his trade or business.  A taxpayer is engaged in a trade or business if the taxpayer is involved in the activity (1) with continuity and regularity, and (2) with the primary purpose of making a profit.  Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); Antonides v. Commissioner, 893 F.2d 656, 659 (4th Cir. 1990), affg. 91 T.C. 656 (1988).

Petitioner has the burden of proving that LFI was engaged in a trade or business and that LFI is entitled to the deductions claimed.[13]  Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934); Welch v. Helvering, 290 U.S. 111 (1933).  If petitioner fails to establish LFI's entitlement to the deductions under

_____

[13]The Internal Revenue Service Restructuring & Reform Act of 1998, Pub. L. 105-206, sec. 3001, 112 Stat. 726, added sec. 7491(a), which is applicable to court proceedings arising in connection with examinations commencing after July 22, 1998. Under sec. 7491, Congress requires the burden of proof to be placed on the Commissioner, subject to certain limitations, where a taxpayer introduces credible evidence with respect to factual issues relevant to ascertaining the taxpayer's liability for tax. In the instant case, petitioners have not raised the application of this provision.  Further, the record indicates that the Commissioner's examinations commenced before July 22, 1998.

section 162,[14] and fails to show error in respondent's determination that LFI was engaged in an activity not for profit, then section 183 limits LFI's deductions for expenses attributable to the activity, as provided in section 183(b).

In order to establish that LFI engaged in an activity for profit, petitioner must show he entertained an actual and honest profit objective[15] in engaging in the activity, even if that objective was unreasonable or unrealistic. Burger v. Commissioner, 809 F.2d 355, 358 (7th Cir. 1987), affg. T.C. Memo. 1985-523; Surloff v. Commissioner, 81 T.C. 210, 233 (1983); Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs. Although section 183 applies at the corporate level with respect to the activities of an S corporation, sec. 1.183-1(f), Income Tax Regs., we consider the intent of petitioner, LFI's sole shareholder, in deciding whether LFI had the requisite profit objective, see Eppler v. Commissioner, 58

---

[14]Sec. 183(c) provides that a taxpayer is engaged in an activity not for profit if the activity is one other than "one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Petitioner argues for the first time on brief that LFI is entitled to deduct its expenses under sec. 212 if we conclude that LFI did not operate a trade or business for profit under sec. 162. Respondent objects to this argument as untimely raised and prejudicial. We agree with respondent and decline to consider petitioner's argument under sec. 212. Estate of Gillespie v. Commissioner, 75 T.C. 374 (1980).

[15]Petitioner bears the burden of proving that he had the requisite profit objective. Rule 142(a).

T.C. 691, 696-699 (1972), affd. without published opinion 486 F.2d 1406 (7th Cir. 1973); Butler v. Commissioner, 36 T.C. 1097 (1961).

In determining whether the requisite intention to make a profit exists, greater weight is to be given to the objective facts than to the taxpayer's self-serving characterization of his intent. Dreicer v. Commissioner, supra at 645; sec. 1.183-2(a), Income Tax Regs. Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of factors to be considered in determining whether the taxpayer has the requisite profit objective. The factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, that are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. No single factor is determinative, and not all factors are applicable in every case. Burger v. Commissioner, supra at 358 n.4; Allen v. Commissioner, 72 T.C. 28, 34 (1979); sec. 1.183-2(b), Income Tax Regs.

Respondent contends that petitioner used Granot Loma as a residence, and that LFI did not own Granot Loma and did not operate a trade or business or otherwise engage in any activity for profit during the relevant years. As we understand it, petitioner's argument is that, from the date petitioners purchased Granot Loma, Granot Loma was a business asset that petitioner and then LFI used in one or more business activities for profit. The activities that petitioner alleges he or LFI conducted for profit at Granot Loma include a Christmas tree farm, a timbering operation, a maple syrup operation, and a rental activity. Petitioner also alleges that petitioners and/or LFI acquired Granot Loma with the intent of renovating and operating it as a commercial property or selling it for a profit. For the reasons set forth below, we agree with respondent.

From the time petitioner and his wife purchased Granot Loma in 1987, petitioner was determined to claim that Granot Loma was a business and began to deduct Granot Loma's expenses, initially for 1987 on a Schedule F, and then through LFI, an S corporation. For 1988, petitioner, through LFI, claimed deductions for depreciation of Granot Loma buildings and improvements (including the lodge which was uninhabitable and in the process of being renovated), other alleged operating expenses, and some of the expenses incurred in renovating the lodge, claiming that Granot Loma was an operating Christmas tree farm. For 1990 through

1992, petitioner, through LFI, claimed that Granot Loma was used exclusively for business, and continued to depreciate Granot Loma buildings and improvements, to deduct all of Granot Loma's alleged operating expenses, and to report as lodging income amounts paid or credited to LFI by petitioner's other companies. On his Federal income tax returns for 1988 through 1992, petitioner deducted passthrough losses from LFI in the aggregate amount of $3,376,634.

In support of LFI's aggressive writeoff of Granot Loma, petitioner asserts that LFI maintained extensive books and records, experimented with and abandoned unprofitable activities, and consulted with various experts regarding the renovation of Granot Loma as a commercial facility. Petitioner also contends that he devoted considerable time and effort to the renovation and operation of Granot Loma, that he regularly used Granot Loma for business meetings throughout the years at issue, and that he intended, among other things, to sell Granot Loma at a profit.

We first examine the activities in which LFI allegedly engaged in order to ascertain whether any of those activities were conducted with sufficient continuity and regularity to satisfy the threshold test for a trade or business. Petitioner contends that Granot Loma was the site of an operating Christmas tree farm, a timbering operation, a maple syrup operation, and a rental activity. In connection with the lodge, LFI also sold at

auction during 1990 various personal property that was not used in the lodge renovation and claimed the auction proceeds as business income.

Although there were isolated episodes in which LFI began to explore possible money-making ventures, these activities never materialized into a real business venture, either individually or collectively. For example, the Christmas tree operation, which began with the planting of trees in 1989, was abandoned within a year after the initial planting because over half of the trees planted had died. Similarly, the experiment with maple sugaring was abandoned after LFI's caretaker's wife suffered burns during the processing of the sap. The timbering operation likewise never got past the exploratory stage. The auction was a one-time sale of excess furnishings that were not used in the renovation of the lodge and, under the circumstances, was the functional equivalent of a garage sale, only on a larger scale. "Carrying on a trade or business" requires a showing of more than initial research into or investigation of business potential. Frank v. Commissioner, 20 T.C. 511, 513 (1953). None of the above-listed activities, either individually or collectively, were conducted with continuity or regularity and, hence, do not constitute a trade or business for purposes of section 162. See Commissioner v. Groetzinger, 480 U.S. at 35.

The only activity allegedly conducted by LFI that warrants detailed examination under sections 162 and 183 is the alleged rental of the lodge.  Beginning in 1989 and continuing throughout the remaining years at issue, LFI billed one of petitioner's other companies for every night spent at Granot Loma by petitioners and their family, friends, and business acquaintances.[16]  LFI arguably conducted this activity, variously characterized by petitioner as a rental business or as the operation of a corporate retreat or lodge, with sufficient continuity and regularity from 1989 through at least 1992 that an examination of whether the activity was conducted with the intent to make a profit is appropriate.  In making the examination, we apply the factors of section 1.183-2(b), Income Tax Regs.

The factors on which petitioner primarily relies in support of his argument that petitioner's and LFI's use of Granot Loma was an activity for profit are the manner in which petitioner and LFI operated Granot Loma, the expertise of petitioner and his advisers, the amount of time and effort petitioner devoted to Granot Loma, and petitioner's expectation that Granot Loma would appreciate in value and ultimately be sold at an economic profit.

The factors on which respondent primarily relies in support

---

[16]In 1990, after petitioner's accountant raised concerns about LFI's ability to withstand scrutiny under sec. 183, petitioner arranged for Granot Loma's caretaker to bill for each time petitioner, his family, and his guests stayed overnight at Granot Loma during 1988, 1989, and the early part of 1990.

of his argument that petitioner's and LFI's use of Granot Loma was not an activity for profit are the substantial history of losses generated by the alleged business activity, the complete lack of any profits from the activity over a 6-year period, petitioner's financial status during the years at issue, and the personal pleasure and recreation derived by petitioners from their use of Granot Loma.

The record in this case reveals that petitioners purchased Granot Loma and renovated the lodge and other parts of the property, in part, for possible commercial use in the future. In so doing, petitioner consulted with advisers regarding equipment and systems to be installed in the lodge and around the property to support commercial use. The record also reveals, however, that the renovation was designed to enable petitioner and his family to use Granot Loma as their residence.

Whatever petitioner's intention might have been regarding the operation of Granot Loma as a commercial property at some point in the future, the evidence convinces us that Granot Loma was purchased primarily for use as petitioners' residence and it was used primarily as a residence; i.e., as petitioners' vacation home. Like any other residence, Granot Loma was used by petitioners for their own enjoyment and to entertain family, friends, and business acquaintances. Occasional entertainment of petitioner's business acquaintances, however, does not support a

conclusion that Granot Loma was used in an activity engaged in for profit.

While it is certainly true that LFI maintained books and records of its activities, the record is devoid of any credible evidence that the books and records were used to make informed business decisions regarding the operation of a business at Granot Loma.  See Golanty v. Commissioner, 72 T.C. 411, 430 (1979) (holding that a taxpayer's books and records should enable the taxpayer to cut expenses, increase profits, and evaluate the overall performance of the operation), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).  LFI did not engage in any market studies or meaningful research regarding the likelihood of operating Granot Loma as a commercial lodge for profit.  It did not set the per capita charges billed to petitioner's other companies by analyzing what was necessary to turn a profit or even by analyzing LFI's total operating costs.  As best we can ascertain from the record, LFI made no meaningful effort to evaluate the cost efficiency of capital expenditures or to cut the costs of "operating" the lodge.

Neither petitioner nor any of his principal advisers had any material experience operating a hotel, motel, or other commercially viable lodging establishment.  Some of petitioner's equipment and system suppliers had commercial experience but only insofar as the design and use of such equipment and systems were

concerned. The only person with resort management experience whom petitioner apparently consulted visited Granot Loma once and merely opined that the property might be used as a resort property without any apparent analysis of the pertinent financial data and without the benefit of any market study into the feasibility of operating such a resort profitably.

Petitioner has conceded that Granot Loma was never operated as a commercial resort and that only invited guests stayed there during the years at issue. In testimony at trial, that concession was explained, at least in part, by the admission that petitioners did not want to open Granot Loma to uninvited guests because it would interfere with their use of the property. The evidence also suggests that, during the years at issue, LFI did not have the licenses and permits to operate a commercial facility required under Michigan State law, that Granot Loma was not insured for business use, and that LFI did not file State liquor tax returns or collect sales tax on its purported gross receipts. Although petitioner vociferously proclaimed throughout the trial that LFI operated Granot Loma for profit and was a real business, LFI did not take even the most minimal of steps under Michigan State law to make its alleged rental activity function like a real business.

Petitioner argues that LFI made changes in its operation of Granot Loma to foster profitability. The principal change he

cites was the annual increase in the per capita rate charged for a visit to Granot Loma. While it is true that LFI increased the per capita rate on an annual basis from 1990 through 1992, the increases were not supported by any meaningful economic analysis, and the rate increases did not have a material impact on LFI's profitability.

Petitioner also argues that, when he purchased Granot Loma, he intended to earn a profit from the property, at least in part, by renovating and selling it as a commercial property. Petitioners paid $4,380,000 for the property, invested approximately $2,500,000 more in renovation costs, and expended millions more in operating costs from 1987 through 1992. Petitioner has not convinced us that he purchased Granot Loma with any intention of selling it at a profit (as opposed to using it as a residence), or that he seriously believed that any appreciation in the fair market value of Granot Loma would be sufficient to offset the cumulative losses and generate a profit.

Petitioner correctly points out that his and LFI's intention to make a profit from Granot Loma need not be reasonable, and he argues that the considerable time he spent working on LFI's alleged business activities provides objective support for his subjective statement of intent. We reject this argument because, like much of the evidence petitioner cites in support of his arguments, the evidence of time spent by petitioner on LFI's

alleged business activities is inadequate, ambiguous, and unconvincing. For example, although petitioner and his family made several visits to Granot Loma during the renovation period, petitioner kept no log or other records of the actual time he spent on the renovation effort. Moreover, even if we were willing to accept petitioner's undocumented claims of time spent on the renovation effort, petitioner's involvement with and "supervision" of the renovation was completely consistent with the desire of any homeowner to make informed decisions regarding the nature and manner of the work to be done and to monitor the renovation on his home. The ambiguous nature of petitioner's testimony renders petitioner's testimony unconvincing and not credible.

Respondent presented a much more compelling picture of the "reality" of Granot Loma. In addition to the regular use of Granot Loma by petitioner and his family, friends, and business acquaintances, respondent introduced evidence showing the following:

(1) Petitioner's accountant "conservatively" concluded that the vast majority of visits paid for by petitioner's companies were for petitioners' personal use of Granot Loma;

(2) during the years at issue, petitioner was a man of considerable financial means who earned millions of dollar each

year from his bond trading activities and who offset his earned income with over $3,300,000 of LFI's losses;

(3) petitioner insured Granot Loma as a second residence and certain personal property at Granot Loma as his personal, and insurable, property;

(4) LFI did not generate a profit from its alleged operation of Granot Loma during any year at issue;

(5) petitioners never transferred Granot Loma's legal title to LFI; and

(6) petitioner and his family, friends, and business acquaintances derived considerable personal pleasure from their use of Granot Loma.

On balance, we conclude that petitioner has failed to prove by a preponderance of evidence that LFI was engaged in the conduct of a trade or business under section 162 or that any activity allegedly conducted by LFI at Granot Loma was an activity for profit.[17]  Consequently, we sustain respondent's determination that LFI was not engaged in an activity for profit.

B.  Respondent's Determinations With Respect to LFI for 1989 and 1990

Section 183 disallows all expenses attributable to an activity not engaged in for profit except as provided in section 183(b).  Section 183(b)(1) allows those deductions which are not

---

[17]Even if we were to reach petitioner's section 212 argument, we would still conclude on this record that LFI was not engaged in an activity for profit.

dependent upon a profit motive, such as interest and taxes.
Section 183(b)(2) allows the deductions that would be allowable
only if the activity was engaged in for profit, but only to the
extent that gross income derived from the activity exceeds the
deductions permitted by section 183(b)(1).

For 1989 and 1990, respondent disallowed all of LFI's
deductions, determined LFI's corrected S corporation income, and
adjusted petitioner's income accordingly. In so doing,
respondent does not appear to have allowed petitioner any
adjustment for allowable deductions under section 183(b) except
with respect to Granot Loma's real estate taxes.[18] This approach
appears to be inconsistent with the approach taken by respondent
for 1991 and 1992, which effectively allowed petitioner to deduct
LFI's expenses to the extent of LFI's income.[19]

Respondent takes the position that LFI did not own Granot
Loma and, consequently, may not deduct depreciation attributable
to the property. Respondent also contends that LFI's other
expenses were not substantiated, that personal and capital
expenditures are not deductible, and that petitioner "failed to
allocate and prove which deductions, if any, are not for personal

[18]For each of the years at issue, respondent increased
petitioner's real estate tax deduction on Schedule A of
petitioner's Federal income tax returns for the real estate taxes
attributable to Granot Loma, presumably because he determined
petitioner owned Granot Loma.

[19]Respondent also disallowed petitioner's deduction of LFI's
loss for 1988. However, LFI did not report any income for 1988.

expenditures". Respondent, nevertheless, allows petitioner to offset LFI's income with LFI's expenses for 1991 and 1992, but not for 1989 or 1990.

Petitioner contends that, although legal title to Granot Loma was never transferred to LFI, LFI owned a beneficial and depreciable interest in the property and that LFI should be allowed to deduct depreciation to the extent provided in section 183(b)(2). Petitioner relies on several cases for the proposition that command over property or enjoyment of its economic benefits marks the real owner for Federal tax purposes. See Speca v. Commissioner, 630 F.2d 554, 557 (7th Cir. 1980) (quoting Anderson v. Commissioner, 164 F.2d 870, 873 (7th Cir. 1947)), affg. T.C. Memo. 1979-120; Hang v. Commissioner, 95 T.C. 74, 80 (1990). Petitioner, however, has failed to convince us that LFI owned any beneficial interest in Granot Loma. The record instead persuasively establishes that petitioners personally controlled, used, and enjoyed Granot Loma throughout the years at issue.

Regarding LFI's other deductions, petitioner did not address respondent's argument that those deductions were unsubstantiated. Ordinarily, a taxpayer is required to substantiate claimed deductions. See sec. 1.6001-1(a), Income Tax Regs. In this case, the parties did not stipulate that LFI incurred any expenses and because petitioners introduced no evidence at trial to prove the nature and amount of LFI's expenses, we would

ordinarily hold that petitioner has failed to prove that LFI paid or incurred any expenses in excess of those allowed by respondent.  In this case, however, because the notices of deficiency take what appear to us to be inconsistent positions with respect to LFI's expenses[20] and, in our view, appear to acknowledge petitioner's entitlement to a deduction for a portion of LFI's expenses under section 183(b) for 1991 and 1992, we shall require respondent to make adjustments for 1989 and 1990 under section 183(b) comparable to those made for 1991 and 1992.

### C.  The Parties' Other Arguments

We decline to address the parties' other arguments regarding LFI as our holdings under sections 162 and 183 adequately dispose of the LFI issues raised by the parties.

### II.  BAC Issues

In the notices of deficiency, respondent recalculated BAC's taxable income by disallowing all of BAC's expenses and making certain adjustments to income, increased petitioner's income by his distributable share of BAC's corrected S corporation income, and allowed petitioner additional miscellaneous Schedule A deductions to the extent of petitioner's distributable share of BAC's income for each of the years at issue.

---

[20]For example, the notices of deficiency allege generally that LFI's losses and/or expenses were not substantiated but allow petitioner an adjustment under sec. 183(b) for some of the years at issue.

In an amendment to petition filed pursuant to a motion for leave to amend petition that we granted, petitioner alleged that he was not entitled to BAC's passthrough losses, reasoning that BAC did not have a valid S corporation election on file at any time during the relevant taxable years, and asserted that we lacked jurisdiction over respondent's BAC adjustments because respondent never issued a notice of deficiency to BAC as a C corporation.  Respondent filed a notice of objection raising the affirmative defenses of equitable estoppel and the duty of consistency and an amendment to answer that clarified that he had not placed the status of BAC as an electing corporation under subchapter S at issue in the consolidated cases.

Section 1362(a) provides that small business corporations may elect to be governed by the provisions of subchapter S and to be taxed thereunder as passthrough entities.  For such an election to be valid, all shareholders of the corporation, as of the date the election is made, are required to consent to the election.  Sec. 1362(a)(2); Wilson v. Commissioner, 560 F.2d 687, 689 (5th Cir. 1977), affg. T.C. Memo. 1975-92.  The parties agree that Mrs. Baldwin did not sign the Form 2553.  The parties do not agree, however, as to whether respondent may continue to treat BAC as an S corporation for the years at issue.  We examine the duty of consistency to resolve the dispute.

A.    The Duty of Consistency

The duty of consistency, sometimes referred to as quasi-estoppel, is an equitable doctrine that Federal courts historically have applied in appropriate cases to prevent unfair tax gamesmanship.  Kielmar v. Commissioner, 884 F.2d 959, 965 (7th Cir. 1989), affg. Glass v. Commissioner, 87 T.C. 1087 (1986); Cluck v. Commissioner, 105 T.C. 324 (1995); LeFever v. Commissioner, 103 T.C. 525 (1994), affd. 100 F.3d 778 (10th Cir. 1996).  The duty of consistency doctrine "is based on the theory that the taxpayer owes the Commissioner the duty to be consistent in the tax treatment of items and will not be permitted to benefit from the taxpayer's own prior error or omission."  Cluck v. Commissioner, supra at 331.  It prevents a taxpayer from taking one position on one tax return and a contrary position on a subsequent return after the limitations period has run for the earlier year, if such contrary position would harm the Commissioner.  Id.

This case is appealable to the Court of Appeals for the Seventh Circuit.  In Kielmar v. Commissioner, supra at 965, the Court of Appeals for the Seventh Circuit held that a taxpayer is placed under a duty of consistency when there has been:  (1) A representation or report by the taxpayer; (2) on which the Commission has relied; and (3) an attempt by the taxpayer after the period of limitations has run to change the previous representation or to recharacterize the situation in such a way

as to harm the Commissioner. Because the duty of consistency is an affirmative defense, respondent bears the burden of proving that it applies. Rule 142(a).

From 1988 until approximately 1 month before trial, petitioner consistently represented to respondent that BAC was an S corporation. Petitioner initially caused Form 2553, Election by a Small Business Corporation, which indicated that Mrs. Baldwin was BAC's sole shareholder and that she had the authority to elect S corporation status for BAC, to be filed on behalf of BAC. Petitioner also caused BAC to file Forms 1120S, U.S. Income Tax Return for an S Corporation, and deducted BAC's passthrough losses on his Forms 1040, U.S. Individual Income Tax Return, for the years at issue. Petitioner did not inform respondent during the audit that the validity of BAC's S corporation election was an issue. Petitioner also represented, under oath, in formal discovery proceedings in this case that BAC was an S corporation. Petitioner now seeks to repudiate BAC's S corporation status, in an effort to deprive this Court of jurisdiction over the BAC issues and respondent of the opportunity to obtain a ruling on the BAC issues raised in this case.

Petitioner argues that the duty of consistency does not apply because respondent has failed to prove that respondent reasonably relied upon BAC's S election when issuing the notices

of deficiency or that respondent suffered any harm as a result of his reliance. Petitioner also contends that the duty of consistency does not apply because petitioner did not intentionally misrepresent BAC's S status or even know that BAC's S election was improper.

Petitioner's argument that respondent could not have reasonably relied upon BAC's S corporation election when issuing the notices of deficiency, because respondent knew or had reason to know the S election was invalid, is based on the testimony of his accountant, Mr. DiMaggio. Mr. DiMaggio testified that the auditing agent, Ms. Witek, became aware of a problem with BAC's S corporation election by watching petitioners' divorce proceeding in 1991.

Taking Mr. DiMaggio's testimony in context, it appears that the problem Mr. DiMaggio described in his testimony involved a dispute between petitioners regarding the ownership of BAC, not the validity of its S election. Even if we were to believe Mr. DiMaggio's testimony that Ms. Witek somehow became aware of a dispute between petitioners regarding the ownership of BAC, we disagree with petitioner's conclusion that such knowledge put respondent on notice regarding a problem with BAC's S election. Although petitioners raised an issue regarding which one of them owned BAC during the pendency of the divorce case, neither petitioner raised or acknowledged any issue concerning the

validity of the S election or conceded that the S election was invalid until approximately 1 month before trial.[21]  In fact, petitioner continued to claim that BAC was an S corporation and to deduct BAC's losses on his tax returns in 1991 and later years.[22]  Because the record contains no credible evidence that respondent knew or had reason to know that BAC's S election was invalid until approximately 1 month before the trial in this case, we reject petitioner's reliance argument.

We also reject petitioner's argument that respondent has not shown he suffered any harm as a result of petitioner's representation.  Petitioner contends that even as a C corporation, BAC would have no taxable income because BAC's deductions exceeded its income for the years at issue.  Petitioner's argument ignores the fact that respondent disallowed all of BAC's deductions, vigorously litigating in a 2-week trial, among other issues, whether BAC's activities were engaged in for profit, whether BAC's deductions were ordinary and necessary

---

[21]Under sec. 1362, once a valid S election has been made, ownership of an S corporation may change without adversely affecting the S election because new owners were not required to consent to the prior S election.  See sec. 1.1362-6(a)(2)(i), Income Tax Regs.

[22]We also note that Mr. DiMaggio's testimony conflicted with the objective facts in the record concerning petitioner's divorce case.  Mr. DiMaggio testified that Ms. Witek learned about a problem with BAC in 1991 while observing the divorce trial, yet the trial in the divorce case did not occur until 1993.

business expenses, whether BAC's deductions were substantiated, and whether the claimed losses were passive losses under section 469. If we were to accept petitioner's concession and refuse to apply the duty of consistency, respondent would be deprived of the opportunity to evaluate BAC's correct tax status or to determine the proper tax effect of BAC's activities for the years at issue. This is so, at least in part, because, if BAC were a C corporation as petitioner contends, the limitations period for assessing income tax deficiencies at the corporate level would have expired. The record reveals that respondent relied on petitioner's representations regarding BAC's S status to his detriment, and we so find.

Finally, we reject petitioner's argument that, because he was not aware of any problem with BAC's S corporation election prior to 1998, he did not have personal knowledge of BAC's failed S corporation election until after the audit was completed and the period of limitations had run for the years at issue. Although petitioner's argument implies to the contrary, personal knowledge is not an element of the duty of consistency. Kielmar v. Commissioner, 884 F.2d 959 (7th Cir. 1989). The duty of consistency may apply to a taxpayer who innocently misrepresents a fact in a time-barred year and to one who misleads intentionally. Beltzer v. United States, 495 F.2d 211, 212 (8th Cir. 1974); Unvert v. Commissioner, 72 T.C. 807, 816 (1979), affd. 656 F.2d 483 (9th Cir. 1981).

Respondent has demonstrated that each of the elements of the duty of consistency identified in Kielmar v. Commissioner, supra, exists in this case. First, petitioner consistently represented BAC as an S corporation for Federal income tax purposes by filing Forms 2553 and 1120S and by treating it as a passthrough entity for tax purposes. Second, respondent has relied upon these representations to his detriment by auditing BAC as an S corporation, making adjustments thereto, and adjusting the income of BAC's sole shareholder as if he were a shareholder in an S corporation. Third, petitioner has altered his previous representation that BAC was a valid S corporation during each of the years at issue in favor of the diametrically opposite representation that BAC was never a valid S corporation. This alteration occurred after the period of limitations on assessment with respect to BAC's returns, if BAC were a C corporation, had expired. See sec. 6501.

On these facts, we hold that the duty of consistency applies and that, therefore, petitioner is estopped from claiming that BAC was not a valid S corporation for the years at issue.

B.   BAC Losses

Because BAC is treated as an S corporation for purposes of this case, we must next address the substance of the parties' arguments with respect to BAC. Respondent contends that BAC did not conduct a trade or business under section 162 or an activity

engaged in for profit under section 183 and that, therefore, he properly disallowed BAC's expenses and recomputed BAC's income. Petitioner asserts that BAC was operated as a trade or business and that its profit motive is demonstrated by a variety of factors, including BAC's effect on the increased profitability of petitioner's related businesses.

### 1.   Activity Not Engaged in for Profit

We have already reviewed the relevant law governing our analysis under sections 162 and 183 in connection with our holding regarding petitioner's deductions of LFI's losses.  We shall not repeat that discussion here.  We turn, instead, to our analysis of whether BAC was a trade or business under section 162 or an activity not engaged in for profit under section 183.

In support of his argument that BAC engaged in its air transportation activity for profit, petitioner contends that BAC maintained adequate business records, periodically consulted with and relied upon experts to operate the activity and to improve its finances, and regularly increased the per-person fees charged to its customers to improve its cashflow.  Respondent contends that BAC was nothing more than a convenient and tax-favorable way for petitioner and his family, friends, and business acquaintances to travel to and from Granot Loma and other vacation sites.  Respondent relies primarily upon BAC's history of substantial losses in each of the years at issue, petitioner's

financial status and income during the years at issue, BAC's and petitioner's failure to follow the advice of BAC's president regarding steps that should be taken to make BAC a profitable venture, and the substantial personal use of BAC's aircraft by petitioner and his invited guests.

Our review of the record in this case confirms that BAC was not an activity engaged in for profit but rather was an activity established, structured, and operated primarily for the personal use and benefit of petitioner. We reach this conclusion by applying the factors set forth in section 1.183-2(b), Income Tax Regs., to the extent pertinent to our analysis, to the relevant facts established by the record.

After petitioners purchased Granot Loma in 1987, petitioner decided to purchase the first of two aircraft. On May 20, 1988, petitioner purchased a King Air and formed BAC to own and operate the aircraft. In August 1988, BAC traded in the King Air for the Sabre. Petitioner regularly used BAC's Sabre to transport himself and his family, friends, and business acquaintances to Granot Loma. In an effort to structure the operation and use of the Sabre as a business, petitioner arranged for BAC to invoice one of his other companies each time the Sabre was used. At no point during any of the years at issue did BAC offer the Sabre for charter by third parties or take the steps necessary to position the Sabre for use in a charter or leasing business.

Nevertheless, in 1993, petitioner's accountant represented to respondent that BAC operated as a charter service, and BAC made similar representations concerning the nature of its business on its tax returns.

Although BAC maintained extensive accounting records as well as separate books of account and a separate checking account, BAC did not consistently generate invoices to petitioner's other companies until May 1989. After November 1990, BAC did not include passenger names other than petitioner's in the aircraft utilization reports and trip recaps maintained by BAC. BAC did not maintain any records regarding the nature of the trips taken on its aircraft; BAC simply contends that each trip was a business trip because BAC charged a fee for everyone who used its aircraft.

The record contains no credible evidence indicating that BAC ever developed a business plan or that it engaged in any market analysis before setting its per-passenger rates. Although BAC increased its per-passenger rates three times during the years at issue, the rate increases were implemented without any market studies in an effort "to successfully withstand any level of IRS scrutiny". BAC did not take any additional steps to increase its income or reduce its expenses despite advice from both petitioner's accountant and David Stubbs, BAC's pilot and

president, in June and July 1989 that BAC's continued losses could have potentially "disastrous adverse tax effects."[23]

The record in this case amply demonstrates that petitioner's use of BAC's aircraft was primarily for personal purposes. That fact, combined with BAC's history of substantial losses which petitioner used to offset his considerable income from trading during the years at issue, leads us to the conclusion that BAC did not engage in its air transportation activity with the intent of making a profit.

2.   Relationship Between BAC's Activity and Petitioner's Related Businesses

Petitioner asserts that BAC's profit motive is demonstrated by the Sabre's effect on the increased profitability of petitioner's related businesses.  Petitioner cites Campbell v. Commissioner, 868 F.2d 833 (6th Cir. 1989), affg. in part and

---

[23]In a memorandum dated July 7, 1989, to petitioner, Mr. Stubbs outlined three options for turning BAC into a profit center.  The three options consisted of the manipulation of company chargeback rates to ensure that BAC was profitable, the operation of BAC as a charter service, and the implementation of a timesharing plan with respect to the Sabre.  BAC did not implement any of the proposals.  In another memorandum dated Apr. 20, 1990, Mr. Stubbs expressed continuing concern over BAC's reliance on loans from petitioner and BCC to cover BAC's expenses and recommended a large increase in the rates charged to petitioner's other companies.  Mr. Stubbs noted, however, that FAA restrictions on passenger fees would force BAC to charge lower fees to outsiders.  In response, BAC increased its intercompany charges from $1,200 per flight hour in 1989 to $2,100 per flight hour in 1990 and to $2,500 per flight hour in 1991.  These rate increases did not eliminate BAC's losses. BAC's losses in 1988 ($195,610), 1989 ($451,102), 1990 ($528,914), 1991 ($381,561), and 1992 ($285,848) exceeded $1.8 million in the aggregate.

revg. in part T.C. Memo. 1986-569, for the proposition that the "entire economic relationship" of related companies must be analyzed when making a determination regarding profit motivation. Petitioner also relies upon several cases holding that the taxpayer had a bona fide profit motive in what he contends are similar situations. See, e.g., Cornfeld v. Commissioner, 797 F.2d 1049 (D.C. Cir. 1986); Horner v. Commissioner, 35 T.C. 231 (1960); Kuhn v. Commissioner, T.C. Memo. 1992-460; Lee v. Commissioner, T.C. Memo. 1986-294; Louismet v. Commissioner, T.C. Memo. 1982-294.

The cases cited by petitioner are readily distinguishable because none of the cases involved an alleged business activity conducted primarily for the personal benefit of the owner. For example, in Campbell v. Commissioner, supra, the Court of Appeals for the Sixth Circuit held that a taxpayer could deduct losses from a partnership where the partnership's only business purpose was to lease an airplane to a corporation controlled by the partners of the partnership. The corporation's employees and officers engaged in extensive air travel in furtherance of the corporation's business and used the partnership's airplane to facilitate that travel. Despite repeated losses in the partnership, the Court of Appeals found a profit motive by considering the overall increase in wealth of the partners through the corporation, accomplished through the use of

transportation and communication efficiencies provided by the partnership airplane.  In addition, the Court of Appeals found that losses were due, in large part, to the dramatic rise in the cost of fuel, inflation, and increased interest rates occurring during the late 1970s and early 1980s.  The Court of Appeals concluded that profits generated by the corporation through the use of the partnership's plane justified a conclusion that the partnership venture was an activity engaged in for profit.

In contrast to the taxpayer in Campbell, petitioner has not proven even an incidental benefit to his commodities trading business or any other business resulting from BAC's activities. Petitioner testified that his unparalleled trading success was due to his relationships with other traders and brokers in the pit and that his discussions with traders and brokers on the plane trips to and from Granot Loma enabled him to build close personal relationships with the brokers and traders.  However, the objective facts in the record demonstrate that after petitioner purchased the King Air and organized BAC in 1988, petitioner's income from his commodities trading business steadily decreased.

Also unlike the situation in Campbell, where the plane leasing partnership was conducted solely to benefit another business and was wholly dependent upon that business, BAC was conducted almost exclusively to benefit petitioner personally.  A

corporation that is operated for the pleasure or recreation of its shareholders is not engaged in a trade or business. <u>Intl. Trading Co. v. Commissioner</u>, 275 F.2d 578, 584 (7th Cir. 1960), affg. T.C. Memo. 1958-104.

The extensive personal use of BAC's aircraft by petitioner and his family, friends, and business acquaintances, coupled with petitioner's failure to prove a legitimate economic connection between his successful commodity trading business and BAC, convinces us that BAC's air transportation activity was not an activity engaged in for profit.

### 3.  Conclusion

After considering the factors listed in section 1.183-2(b), Income Tax Regs., we hold that BAC was not engaged in an activity for profit. We decline to address respondent's other arguments with respect to the BAC adjustments because our conclusion under section 183 adequately disposes of respondent's adjustments with respect to BAC.[24]

---

[24]Pursuant to sec. 183(b), respondent has allowed petitioner additional miscellaneous itemized deductions for BAC's expenses in amounts equal to BAC's corrected S corporation income in each of the years in dispute (before application of the 2-percent adjusted gross income limitation of sec. 67). Consequently, we do not separately address the parties' arguments regarding the calculation of BAC's depreciation deduction under sec. 280F or the ownership of the Cessna that was depreciated by BAC.

III. BCC Issues

Respondent disallowed lodging and travel deductions in the amounts of $9,658, $59,174, and $50,651 that BCC claimed on its 1990, 1991, and 1992 returns, respectively.  Respondent alleged that the deductions were not allowed because they did not meet the requirements of sections 162 and 274.

Petitioner did not address the BCC adjustments in either his opening brief or his reply brief.  Consequently, we deem petitioner to have conceded the adjustments to BCC's lodging and travel deductions.  See Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989); Money v. Commissioner, 89 T.C. 46, 48 (1987).

IV.  Penalties and Additions to Tax

A.   Sec. 6661(a) Addition to Tax

For 1988, respondent determined petitioners are liable for the substantial understatement addition to tax under section 6661.  Section 6661(a) imposes an addition to tax in an amount equal to 25 percent of any underpayment attributable to such substantial understatement.  A substantial understatement exists when the amount of tax required to be shown on a taxpayer's return exceeds the amount shown on the return by the greater of $5,000 or 10 percent of the amount of tax required to be shown on the return.  Sec. 6661; Schirmer v. Commissioner, 89 T.C. 277, 282 (1987).

An understatement for purposes of section 6661 does not include any item for which the taxpayer's return position was supported by substantial authority.  Sec. 1.6661-3(a)(1), Income Tax Regs.  Substantial authority exists when the weight of authorities supporting the treatment is substantial in comparison to the weight of authorities supporting contrary positions.  Sec. 1.6661-3(b)(1), Income Tax Regs.  A position that is arguable but fairly unlikely to prevail in court will not be considered as supported by substantial authority.  Id.  A case having some facts in common with the tax treatment at issue does not constitute authority if the case is materially distinguishable on its facts.  Sec. 1.6661-3(b)(3), Income Tax Regs.

Petitioner does not rely on any cases which, individually or collectively, qualify as substantial authority for his reporting position either with respect to the LFI adjustments or the BAC adjustments.  Petitioner cites Campbell v. Commissioner, 868 F.2d 833 (6th Cir. 1989), revg. T.C. Memo. 1986-569, for the proposition that the "entire economic relationship" of related companies must be analyzed when making a determination regarding profit motivation.  Petitioner also relies on several cases holding that the taxpayer had a bona fide profit motive in what he contends are similar situations.  See, e.g., Cornfeld v. Commissioner, 797 F.2d 1049 (D.C. Cir. 1986); Horner v. Commissioner, 35 T.C. 231 (1960); Kuhn v. Commissioner, T.C.

Memo. 1992-460; Lee v. Commissioner, T.C. Memo. 1986-294;

Louismet v. Commissioner, T.C. Memo. 1982-294. We agree with

respondent that the cases are not substantial authority in favor

of petitioner's position because they are all readily

distinguishable. Sec. 1.6661-3(b)(3), Income Tax Regs.

Section 6661(c) authorizes respondent to waive part or all

of this addition to tax upon a showing by the taxpayer that he

had reasonable cause for the understatement and that he acted in

good faith. Respondent's failure to waive the addition to tax

under section 6661 is subject to review only for abuse of

discretion. Mailman v. Commissioner, 91 T.C. 1079, 1082-1084

(1988); Parsons v. Commissioner, T.C. Memo. 2000-205.

Petitioner did not show that he ever requested a waiver

under section 6661(c) or that respondent ruled on such a waiver.

Even if petitioner had requested a waiver under section 6661(c),

as he seems to suggest, petitioner has not proven he is entitled

to relief under section 6661(c).

We hold that petitioner is liable for the addition to tax

under section 6661 for 1988 if the Rule 155 computation shows a

substantial understatement of income tax.

B. Sec. 6653(a) Addition to Tax for Negligence and Sec. 6662(a) Accuracy-Related Penalty

For 1988, respondent also determined that petitioner is

liable for an addition to tax for negligence or intentional

disregard under section 6653(a)(1). For 1989, respondent

determined that petitioner is liable for the accuracy-related penalty under section 6662(a), alleging that all of the underpayment for 1989 "is due to negligence or disregard of rules or regulations and you have not established that such underpayment of tax was due to reasonable cause." For each of the years 1990 through 1992, respondent determined that petitioner is liable for the accuracy-related penalty under section 6662(a), alleging that all or part of petitioner's underpayment of tax for each of the years at issue "is attributable to one or more of (1) negligence or disregard of rules or regulations, (2) any substantial understatement of income tax, or (3) any substantial valuation overstatement".

As in effect for 1988, section 6653(a)(1) provides that, if any part of an underpayment of tax is due to negligence or disregard of rules or regulations, an amount equal to 5 percent of the underpayment shall be added to the tax. For purposes of section 6653(a), negligence is defined as a "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances", Neely v. Commissioner, 85 T.C. 934, 947 (1985), and includes "any failure to make a reasonable attempt to comply with the provisions" of the Internal Revenue Code (the Code), section 6653(a)(3).

As in effect for 1989, 1990, 1991, and 1992, section 6662(a) imposes a 20-percent accuracy-related penalty on the portion of

an underpayment that, as pertinent here, is due to negligence or intentional disregard of rules or regulations, section 6662(b)(1), a substantial understatement of income tax, section 6662(b)(2), or a substantial valuation misstatement, section 6662(b)(3).[25]

An underpayment is not attributable to negligence or intentional disregard, substantial understatement of income tax, or a valuation misstatement under section 6662 to the extent that the taxpayer shows that he had reasonable cause for the underpayment and that he acted in good faith with respect to such underpayment. Sec. 6664(c); secs. 1.6662-3(a), 1.6664-4(a), Income Tax Regs. To prove he had reasonable cause for an underpayment, a taxpayer must show that he exercised ordinary business care and prudence with respect to the disputed item. United States v. Boyle, 469 U.S. 241 (1985); see also Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 98 (2000). In this case, petitioner bears the burden of proving that he is not liable for the addition to tax under section 6653(a) and the

---

[25]For purposes of sec. 6662(b)(1), negligence is defined to include "any failure to make a reasonable attempt to comply with the provisions of [the Code]", and disregard is defined to include "any careless, reckless, or intentional disregard." Sec. 6662(c). For purposes of sec. 6662(b)(2), there is a substantial understatement of income tax for any taxable year if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on that year's tax return or $5,000. Sec. 6662(d)(1)(A). For purposes of sec. 6662(b)(3), a valuation misstatement is as defined in sec. 6662(e).

penalties under section 6662. Rule 142(a); <u>Richardson v. Commissioner</u>, 125 F.3d 551 (7th Cir. 1997), affg. T.C. Memo. 1995-554; <u>Accardo v. Commissioner</u>, 942 F.2d 444, 453 (7th Cir. 1991), affg. 94 T.C. 96 (1990).

A taxpayer's good faith, reasonable reliance on the advice of an independent professional as to the tax treatment of an item may establish that the taxpayer was not negligent under section 6653(a) and may satisfy the reasonable cause exception of section 6664(c). <u>United States v. Boyle</u>, <u>supra</u>; sec. 1.6664-4(b), Income Tax Regs. Whether a taxpayer reasonably relied on an independent and competent professional requires an examination of the facts and circumstances of his case and applicable law. See sec. 1.6664-4(b)(1), Income Tax Regs. The taxpayer must prove: (1) The adviser was a competent professional who had sufficient expertise to justify the taxpayer's reliance on him; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. <u>Weis v. Commissioner</u>, 94 T.C. 473, 487 (1990) (citing <u>Pessin v. Commissioner</u>, 59 T.C. 473, 489 (1972)).

In support of his determinations, respondent emphasizes petitioner's burden of proof as to the addition to tax and penalties, lists numerous errors and purported errors on petitioner's returns, and asserts that petitioner, with the assistance of Mr. DiMaggio, concocted an elaborate scheme to disguise and deduct personal expenditures. Petitioner contends

that his deductions were claimed in good faith and pursuant to his reasonable reliance upon his professional tax adviser, Mr. DiMaggio, and his lawyers.

Although petitioner places the blame for erroneous reporting positions on both his accountant and his attorney, petitioner directs most of the blame to his accountant, Mr. DiMaggio. Petitioner claims, among other things, that it was Mr. DiMaggio who decided to treat LFI and BAC as businesses under section 162, who decided that LFI and BAC met the material participation requirements of section 469, and who decided to treat BAC as an S corporation for Federal tax purposes. Petitioner also claims that he reasonably relied upon his accountant for all decisions regarding the proper tax treatment of LFI and BAC.

Mr. DiMaggio testified extensively at the trial in this case. Although Mr. DiMaggio admitted that he consulted with petitioner concerning LFI and BAC, at no point during his testimony did Mr. DiMaggio admit that he was responsible for the reporting positions taken on petitioner's returns with respect to LFI and BAC. Mr. DiMaggio's testimony only reinforces the impression left by the record as a whole that he did not have accurate information regarding the use of Granot Loma and the aircraft and that petitioner intended from the time he purchased Granot Loma and the aircraft to claim they were business assets used in a business activity. For example, although Mr. DiMaggio never visited Granot Loma during the years at issue, Mr. DiMaggio

testified that Granot Loma "operated no differently than a Marriott or a Radisson".  Mr. DiMaggio also testified that LFI was operating as a business during 1988 because "people were staying up there, overnight stays for business purposes."  In justifying the decision to depreciate Granot Loma, Mr. DiMaggio testified that "the property was placed in service from a business standpoint the minute Mr. Baldwin purchased it", a position petitioner consistently espoused throughout the trial and briefing of this case.

Petitioner was obligated to prove that he gave all pertinent information necessary to decide the proper tax treatment of Granot Loma and the aircraft to Mr. DiMaggio.  Mr. DiMaggio's testimony leaves us with considerable doubt that petitioner gave Mr. DiMaggio all of the information necessary to determine whether and to what extent LFI and BAC were actually operating a trade or business within the meaning of section 162 or whether the activities conducted by the corporations were not engaged in for profit within the meaning of section 183.

Having observed Mr. DiMaggio and petitioner at trial and heard their testimony, we have no doubt that petitioner was an important and demanding client of Mr. DiMaggio, that Mr. DiMaggio wanted to keep petitioner happy, and that Mr. DiMaggio, without having first received relevant and accurate information, either concluded or accepted petitioner's conclusion that LFI and BAC were legitimate businesses.  Mr. DiMaggio's apparent willingness

to treat LFI and BAC as businesses under section 162 and to ignore his concerns regarding the possible application of section 183 without a healthy degree of skepticism and some meaningful professional analysis falls short of proof establishing that petitioner reasonably relied on the informed and studied advice of a competent tax professional.

We also have considerable doubt whether petitioner acted in good faith when he signed his tax returns for the years at issue. Petitioner, an experienced businessman, knew or certainly should have known that he and his family and invited guests used Granot Loma and BAC's aircraft primarily for personal relaxation and entertainment. Possessed of such knowledge, petitioner cannot credibly claim that he signed his tax returns in good faith. Under the circumstances, petitioner's attempt to avoid liability for the additions to tax and penalties by claiming he did not know any better is ludicrous.

Because petitioner has failed to prove that he was not negligent under sections 6653(a) and 6662 or that he is entitled to relief under section 6664(c), we reject petitioner's arguments that he should be relieved of the section 6653 addition to tax and the section 6662 penalties in these consolidated cases.

V.   <u>Conclusion</u>

We have carefully considered the remaining arguments of both parties for results contrary to those expressed herein and, to the extent not discussed above, find those arguments to be irrelevant, moot, or without merit.

To reflect the foregoing and concessions by both parties,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.