# United States Tax Court

163 T.C. No. 1

EDWARD L. BERMAN AND ELLEN L. BERMAN,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

ANNIE BERMAN,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 202-13, 388-13.                    Filed July 16, 2024.

————

On Ps' respective federal income tax returns for the 2002 taxable year, Ps reported that they each were electing under I.R.C. § 1042 to defer recognition of approximately $4 million of gains on their respective sales of stock to an employee stock ownership plan (ESOP) in that year. Ps' stock was sold in exchange for promissory notes under which no payment was made in the year of sale and payments of approximately $450,000 (to each P) were made the following year (2003). On their respective federal income tax returns for the 2003 taxable year, Ps each reported purchasing qualified replacement property (QRP), *see* I.R.C. § 1042(c)(4), in amounts sufficient to defer recognition under I.R.C. § 1042 of the approximately $4 million of gain each realized on the 2002 stock sales. However, in 2003 Ps each also engaged in purported loan transactions for which their QRP served as purported

collateral. Ps now do not dispute that the purported loans constituted sales of their QRP in 2003.

R issued notices of deficiency to Ps for 2003 through 2008. For 2003 the notices determined that Ps had unreported long-term capital gain of approximately $4 million each, i.e., the entire gains on their 2002 sales of stock that they had reported as deferred for both 2002 and 2003, less the $415,000 fee each paid to engage in the purported loan transaction now conceded to have been a sale.

On cross-motions for partial summary judgment with respect to 2003 and 2004, Ps argue that they did not make valid I.R.C. § 1042 elections or, if the elections were valid, then because the sales of stock to the ESOP in 2002 were installment sales, *see* I.R.C. § 453, they are entitled to report the gains triggered under I.R.C. § 1042(e) by the 2003 sales of the QRP under the installment method. R seeks partial summary judgment to the effect that Ps made valid elections under I.R.C. § 1042 with respect to the gains realized on the stock sales and that, consequently, the timing and amount of the gain recognition must be determined under I.R.C. § 1042(e).

*Held*: Ps made valid I.R.C. § 1042 elections on their 2002 returns to defer the gains realized on their respective sales of stock to an ESOP in that year.

*Held, further*, because Ps did not affirmatively elect not to have the income from the installment sales of their stock taken into account under the installment method and also made deferral elections under I.R.C. § 1042, the gain that must be recognized upon the disposition of their QRP in 2003 is determined under the installment method and equals that proportion of the payments Ps received in 2003 which Ps' gross profits on the sales of their stock bear to the total price to be received for the stock.

*Held, further*, the gains that would be recognized under the installment method for 2003 are initially deferred pursuant to I.R.C. § 1042(a), requiring

corresponding adjustments to the bases of their QRP under I.R.C. § 1042(d) equal to the amounts of the deferred gains.

*Held, further*, Ps' sales of their QRP in 2003 cause recapture of the installment sale gains initially deferred under I.R.C. § 1042(a).

*Held, further*, because Ps disposed of their QRP in 2003, the gains they must recognize for 2004 are determined under the installment method and are equal to that proportion of the payments Ps received in 2004 which Ps' gross profit on the sales of their stock bears to the total price to be received for the stock.

————————

*Brian G. Isaacson*, for petitioners.

*Jonathan E. Behrens*, *Scott A. Hovey*, and *Warren P. Simonsen*, for respondent.

OPINION

GALE, *Judge*: These consolidated cases are before us on the parties' Cross-Motions for Partial Summary Judgment. *See* Rule 121.[1] The Motions present an issue of first impression concerning the interplay of the income deferral provisions of section 1042—which generally permits an electing taxpayer to defer recognition of realized gain on the sale of stock to an employee stock ownership plan (ESOP), provided he acquires qualified replacement property (QRP) within a specified period—and section 453—which dictates, unless the taxpayer affirmatively elects not to have the provision apply, that the gain from any disposition of property, where at least one payment is to be received after the close of the taxable year in which the disposition occurs, shall

———————————

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure, in effect at all relevant times.

4

be taken into account under the installment method, which generally defers gain until the year or years when payment is received.

In 2002 petitioners Edward L. (Edward) and Ellen L. Berman (Docket No. 202-13) and Edward's cousin, Annie Berman (Annie) (Docket No. 388-13),[2] each sold stock to an ESOP for $4,150,000 in which they had bases of $27,428, thereby realizing a gain of $4,122,572 each. As payment, each received a $4,150,000 promissory note, on which a first payment of $449,277 was made in 2003. Although they now argue to the contrary, petitioners made valid elections under section 1042 on their 2002 federal income tax returns to defer recognition of the gain each realized for 2002. Effecting that deferral required that they purchase QRP (at a cost equal to or exceeding the realized gain) within 12 months of the stock sales, a period that extended into their 2003 taxable year. On their 2003 returns they reported the acquisition of sufficient qualified replacement property in 2003 within the replacement period, ostensibly qualifying them to defer recognition of the entire $4,122,572 gain each realized on the stock sales, pursuant to section 1042.

However, also during 2003 petitioners used the QRP in so-called Derivium 90% loan transactions; that is, they pledged the QRP as collateral for purported loans equal to 90% of the property's value with the purported lender retaining the remaining 10% as a fee. The repayment terms of the purported loans were such that this and other courts have consistently held that the purported loans were sales of the property pledged as collateral. *See Calloway v. Commissioner*, 135 T.C. 26 (2010), *aff'd*, 691 F.3d 1315 (11th Cir. 2012); *see also Landow v. Commissioner*, T.C. Memo. 2011-177; *Sollberger v. Commissioner*, T.C. Memo. 2011-78, *aff'd*, 691 F.3d 1119 (9th Cir. 2012); *Shao v. Commissioner*, T.C. Memo. 2010-189. Petitioners do not now dispute that the Derivium 90% loan transactions in which they engaged using the QRP constituted sales of that property.

Under section 1042(e) a taxpayer's sale of QRP triggers a recapture of the previously deferred gain. (This is accomplished through the imposition of a basis reduction rule whereby the taxpayer's basis in the QRP is reduced by the amount of the realized gain for which recognition is deferred. *See* § 1042(d).) Citing the section 1042(e)

---

[2] Ellen L. Berman is a party to this case only by virtue of having filed joint federal income tax returns with Edward for 2003–08 (years at issue). Unless otherwise indicated, all references to petitioners hereinafter are to Edward and Annie.

recapture rule, respondent takes the position that petitioners' sale of the QRP in 2003 requires them to recognize the entire $4,122,572 of gain each deferred, notwithstanding the fact that each had received a payment of only $449,277 for the stock in that year (and nothing in 2002). Petitioners contend that because they disposed of their stock in installment sales, they are entitled to recognize any gains on the sales— no longer shielded by section 1042—under the installment method. In that event, the gains they are required to recognize for 2003 would be that proportion of the $449,277 payment each received in 2003 which the gross profit on the sale bears to the total contract price. *See* § 453(c). For the reasons discussed hereinafter, we agree with petitioners.

*Background*

There is no dispute as to the following facts,[3] which are drawn from the parties' pleadings; summary judgment papers, as supplemented; and Stipulations of Facts (and Exhibits attached thereto) filed previously.[4] At the time they filed their respective Petitions, Edward L. and Ellen L. Berman resided in New York, and Annie Berman resided in Florida.

---

[3] Petitioners each reported on their 2003 returns that they had acquired approximately $4,150,000 worth of floating rate notes (FRNs)—an amount equal to the gains they each realized from the sale of their ESOP stock. The approximately $4,150,000 in FRNs each reported consisted of Colgate Palmolive FRNs costing approximately $1 million, Merck & Co. FRNs costing approximately $1,075,000; Gillette FRNs costing $1 million, and UPS FRNs costing $1,075,000. They maintained that position in their respective Petitions. However, petitioners thereafter filed Amended Petitions averring that they did not in fact acquire ownership of the Colgate Palmolive FRNs or the Merck & Co. FRNs. They maintain that position in their Motions for Partial Summary Judgment. Consequently, petitioners' acquisition of the foregoing FRNs is a disputed fact. We therefore confine our holdings herein to the Gillette and UPS FRNs, the acquisition and disposition of which are undisputed.

[4] Certain matters were deemed stipulated pursuant to Rule 91(f).

I.     *2002*

    A.     *Sale of E.M. Lawrence Stock to E.M. Lawrence ESOP*

        1.     *E.M. Lawrence ESOP*

On September 1, 2002, E.M. Lawrence, Ltd. (E.M. Lawrence),[5] a New Jersey corporation, established the E.M. Lawrence, Ltd. Employee Stock Ownership Plan (E.M. Lawrence ESOP).

        2.     *Revocation of E.M. Lawrence's S Election*

For 2002 E.M. Lawrence was a fiscal year taxpayer with a taxable year from September 1, 2002, to August 31, 2003.  In a letter addressed to the Internal Revenue Service (IRS) service center in Holtsville, New York, dated November 7, 2002, Edward, acting in his capacity as chief executive officer (CEO) of E.M. Lawrence, wrote the following:

> E.M. Lawrence, Ltd., a New Jersey corporation ("Corporation") has previously made the S Corporation election.  The Corporation hereby revokes its election under IRC Section 1362(a).[6]  This revocation shall take effect on September 1, 2002.

Attached to the letter were shareholder consents to the revocation executed by Edward and Annie, each of whom reported owning 1,000 of

---

[5] The Court's review of petitioners' 2002 returns after the Partial Summary Judgment Motions were filed revealed that E.M. Lawrence, the corporation whose shares petitioners sold to the ESOP, was reported to be an S corporation for some or all of that year.  A taxpayer may elect section 1042(a) only with respect to a sale of "qualified securities," and section 1042(c)(1) defines that term to mean certain securities "issued by a domestic C corporation."  *See* Small Business Job Protection Act of 1996, Pub. L. No. 104-188, § 1316(d)(3), 110 Stat. 1755, 1786 (amending section 1042(c)(1)(A) by striking "domestic corporation" and inserting "domestic C corporation").  Therefore, the Court directed the parties to supplement their respective motions by addressing whether the record supports a finding for purposes of summary judgment that E.M. Lawrence was a domestic C corporation at the time petitioners sold their ESOP shares.  We discuss E.M. Lawrence's tax status at the time of the sale and its impact on section 1042 elections *infra* pp. 21–24.

[6] Section 1362(a) allows a small business corporation to elect to be an S corporation for its current taxable year on or before the 15th day of the third month of that taxable year.  § 1362(b)(1)(B).  An election under section 1362(a) is effective for the taxable year and for all succeeding taxable years, until the election is terminated.  § 1362(c).  E.M. Lawrence initially elected to be taxed as an S corporation on September 1, 1986.

the 2,000 issued and outstanding shares (including nonvoting shares) of the corporation.

On November 13, 2002, petitioners' representative mailed the letter and shareholder consents to the Holtsville Service Center, requesting the revocation of E.M. Lawrence's section 1362(a) election, effective September 1, 2002. The IRS subsequently granted the revocation, notifying E.M. Lawrence by letter dated January 27, 2003, that its election to be treated as an S corporation had been revoked, effective September 1, 2002, as requested.[7]

### 3. *Stock Purchase Agreement*

As of November 8, 2002, petitioners each owned 50% interests in E.M. Lawrence. On that date, petitioners entered into stock purchase agreements to sell 40,000 shares of Class B ESOP Convertible Preferred Stock in E.M. Lawrence (ESOP stock) to the E.M. Lawrence, Ltd. Employee Stock Ownership Trust (E.M. Lawrence ESOT) for a total purchase price of $8.3 million. Petitioners each had bases of $27,428 in the 20,000 shares of ESOP stock that each owned, and each received a $4.15 million promissory note from the E.M. Lawrence ESOT in exchange for the shares.

### 4. *Seller Credit Agreements and Promissory Notes*

The E.M. Lawrence ESOT financed its purchase of the ESOP stock by borrowing $4.5 million from each petitioner (as evidenced by the aforementioned promissory notes), pursuant to seller credit agreements dated November 8, 2002.[8]

Petitioners did not receive any payments in 2002 pursuant to the promissory notes.

---

[7] Petitioners did not contact the IRS after receiving the January 27, 2003, letter to clarify the effective date of the revocation of E.M. Lawrence's S election. Neither did petitioners raise the effective date of E.M. Lawrence's S election revocation as an issue during respondent's audit of their 2003 through 2008 returns.

[8] According to the stock purchase agreement and the seller credit agreement, the E.M. Lawrence ESOT was established pursuant to the E.M. Lawrence ESOP and subject thereto.

B.    *2002 Returns*

1.    *Edward's 2002 Return*

Edward (and his spouse) jointly filed a timely federal income tax return for 2002.  The return did not report any gain with respect to Edward's sale of the ESOP stock, nor did it include a Form 6252, Installment Sale Income.

Attached to Edward's 2002 return was a document titled "Statement of Section 1042 ESOP Rollover Election" (statement of election).  The statement of election identified Edward as the "Taxpayer" (by name and Social Security number), bore his signature, and stated:

> Pursuant to Section 1042 of the Internal Revenue Code of 1986, as amended (the "Code"), the undersigned taxpayer hereby elects not to recognize the gain realized on the sale of the "qualified securities" (as defined in Section 1042 of the Code) set forth below to the E.M. Lawrence, Ltd. Employee Stock Ownership Trust.  In support of this election and pursuant to Treasury Regulation § 1.1042-1T[, Q&A-3],[9] the taxpayer submits the following information:
>
> 1.  Description of Qualified Securities Sold: The "qualified securities" consist of 20,000 shares of Class B ESOP Convertible Preferred Stock in E.M. Lawrence, Ltd.
>
> 2.  Date of Sale of Qualified Securities: The qualified securities were sold on November 8, 2002.
>
> 3.  Basis of Qualified Securities: The adjusted basis of the qualified securities is $25,000.[10]
>
> 4.  Amount Realized Upon the Sale of the Qualified Securities: The amount realized upon the sale of the qualified securities is $4,150,000.
>
> 5.  Identity of Employee Stock Ownership Plan: The employee stock ownership plan to which the qualified

---

[9] As discussed *infra* pp. 19–21, Temporary Treasury Regulation § 1.1042-1T, Q&A-3, prescribes the time and manner for making a section 1042 election.

[10] The parties have stipulated that Edward's basis in his ESOP stock was in fact $27,428.

securities were sold is the E.M. Lawrence, Ltd. Employee Stock Ownership Plan.

6.  Identity of Other Taxpayers: As part of a prearranged agreement, Annie S. Berman (SS# [redacted]) sold 20,000 shares of Class B ESOP Convertible Preferred Stock in E.M. Lawrence, Ltd.

7.  Statement of Purchase: There were no purchases of qualified replacement property as of the date of this election, December 31, 2002.  Statements of Purchase for qualified replacement property purchased after the date of this election will be filed with the taxpayer's income tax return for 2003.

8.  Employer's Consent to Application of Section 4978 of the Code: A verified written statement consenting to the application of Section 4978 of the Code, executed by E.M. Lawrence, Ltd. whose employees are covered by the plan described in paragraph 5 above, is attached hereto.

As stated in paragraph 8 of the statement of election, a document titled "E.M. LAWRENCE, LTD. Consent to the Application of Sections 4978 and 4979A of the Internal Revenue Code of 1986, as amended"[11] (statement of consent) was attached thereto.  The statement of consent specified:

1.  On November 8, 2002, Edward Berman, an individual ("E. Berman") and Annie Berman, an individual ("A. Berman," and together with E. Berman, collectively, the "Selling Shareholders"), each sold a portion of their shares, in E.M. Lawrence, Ltd., a New Jersey corporation (the "Corporation"), to the E.M. Lawrence, Ltd. Employee Stock Ownership Plan and Trust.

2.   Each of the Selling Shareholders will elect not to recognize the gain realized upon the above-mentioned sale under Section 1042 of the Internal Revenue Code of 1986, as amended (the "Code").

_____

[11] In general, sections 4978 and 4979A provide for the imposition of excise taxes under certain conditions on the employer sponsoring an ESOP that acquires qualified securities in a sale to which section 1042(a) applies.

3. Under Section 1042(b)(3)(B) of the Code, such an election must be accompanied by a verified written statement from the employer whose employees are covered by the Employee Stock Ownership Plan participating in the purchase of shares consenting to the application of Sections 4978 and 4979A of the Code.

4. The Corporation employs the employees covered by the E.M. Lawrence, Ltd. Employee Stock Ownership Plan and Trust.

5. The Corporation hereby consents to the application of Sections 4978 and 4979A of the Code.

Under penalty of perjury, this document was executed on November 8, 2002.

The statement of consent bore the signatures of Annie and Edward, the latter of whom was identified as acting in his capacity as CEO of E.M. Lawrence.

Respondent accepted Edward's 2002 return as filed and did not audit it.

### 2. *Annie's 2002 Return*

Although Annie's original 2002 return did not report (or reference) her sale of the ESOP stock, nor include a Form 6252 reporting any installment sale income, she filed an amended return for 2002 that made a section 1042 election. "FILED PURSUANT TO REV. PROC. 92-85"[12] was printed at the top of the 2002 amended return. Annie did not

___

[12] Rev. Proc. 92-85, § 1, 1992-2 C.B. 490, 490, "provide[s] relief to taxpayers who reasonably and in good faith fail to make a timely election when granting relief will not prejudice the interests of the government." Rev. Proc. 92-85, § 4.02, 1992-2 C.B. at 491, provides, inter alia, an automatic six-month extension from the due date of the return to make an election when the Code prescribes (as it does in the case of section 1042(c)(6)) that the election be made by the due date of the return or the due date of the return including extensions. Rev. Proc. 92-85, § 4.02, states that the corrective action required for an automatic extension "is amending the filed return in the manner required to perfect the election." Rev. Proc. 92-85, § 4.03, further states that "[a]ny return, statement of election, or other form of filing that must be made to obtain an automatic extension must provide the following statement at the top of the document: 'FILED PURSUANT TO REV. PROC. 92-85'." After the issuance of Rev. Proc. 92-85, the Secretary issued regulations adopting and revising the standards

include a Form 6252 reporting any installment sale income with the amended return.

Part II, Explanation of Changes to Income, Deductions, and Credits, stated:

> AMENDED FILING IS PURSUANT TO REV. PROC. 92-85 TO INCLUDE AN ELECTION PURSUANT TO TREASURY REG. SEC. 1.1042-1T TO NOT RECOGNIZE THE GAIN REALIZED ON THE SALE OF QUALIFIED SECURITIES TO AN ESOP.

Annie attached to her 2002 amended return a document titled "Statement of Section 1042 ESOP Rollover Election" that was in all material respects identical to the statement of election filed with Edward's 2002 return. Also attached was a statement of consent to the application of sections 4978 and 4979A that was identical in all material respects to the statement of consent filed with Edward's 2002 return.

Respondent accepted Annie's amended 2002 return as filed and did not audit it.

II.    *2003*

    A.    *Acquisition and Sale of QRP*

        1.    *Edward's QRP*

On October 22, 2003, Edward purchased the following: (1) a Gillette FRN with a face value of $1 million and (2) a UPS FRN with a face value of $1.075 million. Edward financed approximately 75% of the purchase price of each FRN with margin debt.[13]

On October 23, 2003, Edward transferred the Gillette and UPS FRNs, along with the attached margin debts of $750,483.13 and $806,715.51, to Bancroft Ventures, Ltd. (Bancroft), a company affiliated

---

for relief set forth therein. *See* T.D. 8680, 1996-2 C.B. 194; *see also* Treas. Reg. § 301.9100-2.

[13] Edward's total cost for the Gillette FRN was $1,000,483.13, consisting of $1 million in principal, $477.78 of accrued interest, and a processing fee of $5.35. Edward paid $250,000 in cash and assumed $750,483.13 of margin debt to effect the purchase. Edward's total cost for the UPS FRN was $1,075,465.51, consisting of $1.075 million in principal, $460.16 of accrued interest, and a processing fee of $5.35. Edward paid $268,750 in cash and assumed $806,715.51 of margin debt to effect the purchase.

with Derivium Capital LLC (Derivium).[14] On that same day, Bancroft paid the margin debts respectively attached to the Gillette and UPS FRNs.

The next day, October 24, 2003, Bancroft sold the Gillette FRN for $1 million. Bancroft retained 10% of the proceeds ($100,000) and, after offsetting the $750,483.13 margin debt it had paid, transferred the balance ($149,516.87) to Edward. On that same day, Bancroft also sold the UPS FRN for $1.075 million. Bancroft retained 10% of the proceeds ($107,500) and, after offsetting the $806,715.51 margin debt it had paid, transferred the balance ($160,784.49) to Edward.

### 2.    *Annie's QRP*

On October 22, 2003, Annie purchased a UPS FRN with a face value of $1.075 million. Annie financed approximately 75% of the purchase price with margin debt.[15]

On October 23, 2003, Annie transferred the UPS FRN, along with the $806,715.51 margin debt attached thereto, to Bancroft. On that same day, Bancroft paid the margin debt attached to the UPS FRN.

The next day, October 24, 2003, Bancroft sold the UPS FRN for $1.075 million. Bancroft retained 10% of the proceeds ($107,500) and, after offsetting the $806,715.51 margin debt it had paid, transferred the balance ($160,784.49) to Annie.

---

[14] Derivium, its affiliates, and its customers have been involved in numerous civil and criminal cases relating to Derivium's 90% loan program. *See Sollberger*, T.C. Memo. 2011-78, slip op. at 3 n.2 (collecting cases); *see also Berman v. Morgan Keegan & Co.*, No. 10 Civ. 5866, 2011 WL 1002683 (S.D.N.Y. Mar. 14, 2011) (granting defendant Morgan Keegan's motion to dismiss Edward and Annie's complaint against the company for allegedly aiding and abetting Bancroft and Derivium in their conversion of the FRNs at issue), *aff'd*, 455 F. App'x 92 (2d Cir. 2012). Derivium eventually went bankrupt and is widely reported to have been involved in a Ponzi scheme. *See Shao*, T.C. Memo. 2010-189, slip op. at 9–15 (discussing Derivium's history).

[15] Annie's total cost for the UPS FRN was $1,075,465.51, consisting of $1.075 million in principal, $460.16 of accrued interest, and a processing fee of $5.35. Annie paid $268,750 in cash and assumed $806,715.51 of margin debt to effect the purchase.

On November 5, 2003, Annie purchased a Gillette FRN with a face value of $1 million. Annie again financed approximately 75% of the purchase price with margin debt.[16]

On November 7, 2003, Annie transferred the Gillette FRN, along with the $754,052.90 margin debt attached thereto, to Bancroft. On that same day, Bancroft paid the margin debt attached to the Gillette FRN and sold the Gillette FRN for $1 million. Bancroft retained 10% of the proceeds ($100,000) and, after offsetting the $754,052.90 margin debt it had paid, transferred the balance ($145,947.10) to Annie.

B.      *Promissory Note Payments*

In 2003 Edward and Annie each received principal payments of $449,277 (and $198,973 in interest) on the promissory notes that had been given by the ESOT.

C.      *2003 Returns*

1.      *Edward's 2003 Return*

Edward (and his spouse) jointly filed a timely federal income tax return for 2003. The 2003 return did not report gain with respect to Edward's sale of the ESOP stock nor include a Form 6252 reporting any installment sale income.

Edward attached two documents to his 2003 return, both titled "Section 1042 Statement of Purchase." Each statement of purchase identified two securities, which Edward therein declared "to be qualified replacement property within the meaning of Internal Revenue Code Section 1042(c)(4) with respect to the November 8th, 2002 sale of 20,000 shares of E.M. Lawrence, Ltd[.] Class B ESOP Convertible Preferred Stock to the E.M. Lawrence, Ltd. Employee Stock Ownership Plan."

The first statement of purchase provided the following information "[i]n accordance with Treasury Regulation Section 1.1042-1T":

| Date of Purchase | Description of Replacement Property | Cost |
| --- | --- | --- |

---

[16] Annie's total cost for the Gillette FRN was $1,000,817.57, consisting of $1 million in principal, $812.12 of accrued interest, and a processing fee of $5.35. Annie paid $246,764.67 in cash and assumed $754,052.90 of margin debt to effect the purchase.

| October 16, 2003 | Colgate Palmolive FRN<br>Maturity Date 8/22/2042<br>CUSIP 19416QDD9 | $1,001,291.11 |
| --- | --- | --- |
| October 16, 2003 | Merck & Co. FRN<br>Maturity Date 8/22/2042<br>CUSIP 58933NAW9 | 1,076,137.11 |

The second statement of purchase provided the following information, also "[i]n accordance with Treasury Regulation Section 1.1042-1T":

| Date of Purchase | Description of Replacement Property | Cost |
| --- | --- | --- |
| October 16, 2003[17] | Gillette FRN<br>Maturity Date 4/02/2043<br>CUSIP 37576GAQ3 | $1,000,000 |
| October 22, 2003 | UPS FRN<br>Maturity Date 2/28/2053<br>CUSIP 911312AF3 | 1,075,000 |

Both statements of purchase were signed by Edward.

### 2. *Annie's 2003 Return*

Annie timely filed a federal income tax return for 2003. The return did not report any gain with respect to Annie's sale of the ESOP stock nor include a Form 6252 reporting any installment sale income.

Annie attached two documents to her 2003 return, both titled "Section 1042 Statement of Purchase." Each statement of purchase identified two securities, which Annie therein declared "to be qualified replacement property within the meaning of Internal Revenue Code Section 1042(c)(4) with respect to the November 8th, 2002 sale of 20,000 shares of E.M. Lawrence, Ltd[.] Class B ESOP Convertible Preferred Stock to the E.M. Lawrence, Ltd. Employee Stock Ownership Plan."

---

[17] The parties have stipulated that the actual date of purchase was October 22, 2003.

The first statement of purchase provided the following information "[i]n accordance with Treasury Regulation Section 1.1042-1T":

| Date of Purchase | Description of Replacement Property | Cost |
|---|---|---|
| October 16, 2003 | Merck & Co. FRN<br>Maturity Date 8/22/2042<br>CUSIP 58933NAW9 | $1,076,137.11 |
| October 30, 2003 | Colgate Palmolive FRN<br>Maturity Date 8/22/2042<br>CUSIP 19416QDD9 | 1,001,613.89 |

The second statement of purchase provided the following information, also "[i]n accordance with Treasury Regulation Section 1.1042-1T":

| Date of Purchase | Description of Replacement Property | Cost |
|---|---|---|
| October 22, 2003 | UPS FRN<br>Maturity Date 2/28/2053<br>CUSIP 911312AF3 | $1,075,000 |
| November 5, 2003 | Gillette FRN<br>Maturity Date 4/02/2043<br>CUSIP 37576GAQ3 | 1,000,000 |

Both statements of purchase were signed by Annie.

III. *2004*

A. *Promissory Note Payments*

In 2004 Edward and Annie received principal payments of $50,148 and $49,784, respectively, on the promissory notes from the ESOT. No further payments were made on the promissory notes through 2009.

B. *2004 Returns*

1. *Edward's 2004 Return*

Edward (and his spouse) jointly filed a timely federal income tax return for the 2004 taxable year. The return did not report any gain

with respect to Edward's sale of the ESOP stock nor include a Form 6252 reporting any installment sale income.

> ### 2. *Annie's 2004 Return*

Annie timely filed a federal income tax return for the 2004 taxable year. The return did not report any gain with respect to Annie's sale of the ESOP stock nor include a Form 6252 reporting any installment sale income.

## IV. *Procedural Matters*

In October 2012 respondent sent petitioners separate notices of deficiency determining, inter alia,[18] increases in their respective long-term capital gains for 2003 attributable to the transfers of their QRP in that year to Bancroft, which were deemed to be sales. Petitioners timely petitioned the Court for redeterminations.

As noted, the parties have filed Cross-Motions for Partial Summary Judgment asking the Court to decide whether the elections petitioners reported on their 2002 returns, deferring recognition under section 1042(a) of gains realized from their respective sales of stock to an ESOP in that year, preclude them from subsequently using the installment method under section 453 to report the recapture of those gains upon disposition of the QRP in 2003.

> ### *Discussion*

The purpose of summary judgment is to expedite litigation and avoid unnecessary and time-consuming trials. *See FPL Grp., Inc. & Subs. v. Commissioner*, 116 T.C. 73, 74 (2001); *Fla. Peach Corp. v. Commissioner*, 90 T.C. 678, 681 (1988). We may grant partial summary judgment when there is no genuine dispute of material fact and a decision may be rendered as a matter of law. Rule 121(a)(2); *Elec. Arts, Inc. v. Commissioner*, 118 T.C. 226, 238 (2002); *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994). In the instant cases, as their Cross-Motions for Partial Summary

---

[18] The notices of deficiency cover petitioners' respective federal income tax for 2003 to 2008 and involve other determinations not relevant to the present motions.

Judgment reflect, the parties agree on sufficient material facts[19] to resolve the motions.

Petitioners argue that because the ESOP stock sales in 2002 were installment sales, they are entitled to report the gains recaptured pursuant to section 1042(e) under the installment method prescribed in section 453. Respondent argues that petitioners validly elected to defer the gains from the ESOP stock sales under section 1042(a) and that, consequently, the timing and amount of the recaptured gains must be determined under section 1042(e).

I.    *Presumptive Applicability of Installment Method*

Section 453(a) provides generally that "for purposes of" the Internal Revenue Code, income from an installment sale "shall" be taken into account under the installment method. A taxpayer may elect not to have the installment method apply, but he must do so affirmatively on or before the due date of his return for the year of the sale; the installment method presumptively applies in the absence of such an election. *Bolton v. Commissioner*, 92 T.C. 303, 304–05 (1989); *see also Bus. Ventures Int'l v. Olive*, 893 F.2d 641, 646 (3d Cir. 1990). This rule, embodied in amendments to section 453 made by the Installment Sales Revision Act of 1980, Pub. L. No. 96-471, § 2(a), 94 Stat. 2247, 2247, reversed prior law, under which a taxpayer had to affirmatively elect to use the installment method (assuming he had not previously taken a prior position inconsistent with that method). *See Bolton*, 92 T.C. at 304–05.

As for making an election out of the installment method, the legislative history documents the drafters' intention that one means of doing so would be to report the entire gain for the year of the sale in gross income,[20] and temporary regulations promulgated by the Treasury reflect that intention. *See* Temp. Treas. Reg. § 15a.453-1(d)(3)(i) ("A taxpayer who reports an amount realized equal to the selling price including the full face amount of any installment obligation on the tax

---

[19] As mentioned *supra* note 3, petitioners now assert that they did not acquire ownership of the Merck & Co. and Colgate Palmolive FRNs; however, resolution of that dispute is not necessary for purposes of ruling on the present motions.

[20] The Senate Finance Committee report accompanying the Installment Sales Provision Act of 1980 states: "It is anticipated that reporting the entire gain in gross income for the taxable year in which the sale occurs will operate as an election not to have installment sale reporting apply." S. Rep. No. 96-1000, at 12 (1980), *reprinted in* 1980-2 C.B. 494, 500.

return filed for the taxable year in which the installment sale occurs will be considered to have made an effective election [not to have the installment method apply].").

An installment sale for this purpose means "a disposition of property where at least 1 payment[21] is to be received after the close of the taxable year in which the disposition occurs," § 453(b)(1), but does not include dispositions by dealers or of property of a kind which is required to be included in the inventory of the taxpayer, § 453(b)(2).

The installment method applies without regard to whether the taxpayer reported income on his return consistent with that method— that is, a taxpayer's failure to report income consistently with the installment method does not cause the method to cease to govern the proper reporting of income from an installment sale. *See, e.g., Bolton*, 92 T.C. 303 (holding taxpayers who failed to report cash payment received in year of installment sale and instead reported entire gain in year after sale were nevertheless required to report on the installment method).

II. *Electing Deferral Under Section 1042*

Section 1042 provides, generally, that a taxpayer may elect to defer recognition of the gain from a sale of stock to an ESOP in certain circumstances. Gain deferral under section 1042 operates by means of a nonrecognition provision, *see* § 1042(a), a basis reduction provision, *see* § 1042(d), and a gain recapture provision, *see* § 1042(e).

The nonrecognition provision provides:

> Sec. 1042(a). Nonrecognition of gain.—If—
> (1) the taxpayer or executor elects in such form as the Secretary may prescribe the application of this section with respect to any sale of qualified securities,
> (2) the taxpayer purchases qualified replacement property within the replacement period, and
> (3) the requirements of subsection (b) are met with respect to such sale,

---

[21] A "payment" for this purpose generally does not include the receipt of evidence of indebtedness of the person acquiring the property. § 453(f)(3).

then the gain (if any) on such sale which would be recognized as long-term capital gain shall be recognized only to the extent that the amount realized on such sale exceeds the cost to the taxpayer of such qualified replacement property.

The basis adjustment provision provides, in relevant part:

Sec. 1042(d). Basis of qualified replacement property.—The basis of the taxpayer in qualified replacement property purchased by the taxpayer during the replacement period shall be reduced by the amount of gain not recognized by reason of such purchase and the application of subsection (a). If more than one item of qualified replacement property is purchased, the basis of each of such items shall be reduced by an amount determined by multiplying the total gain not recognized by reason of such purchase and the application of subsection (a) by a fraction—

(1) the numerator of which is the cost of such item of property, and

(2) the denominator of which is the total cost of all such items of property.

The gain recapture provision provides, in relevant part:

Sec. 1042(e). Recapture of gain on disposition of qualified replacement property.—

(1) In general.—If a taxpayer disposes of any qualified replacement property, then, notwithstanding any other provision of this title, gain (if any) shall be recognized to the extent of the gain which was not recognized under subsection (a) by reason of the acquisition by such taxpayer of such qualified replacement property.

The Secretary has prescribed a regulation for the time and manner of making an election under section 1042, *see* Temp. Treas. Reg. § 1.1042-1T, Q&A-3, which provides:

A-3: (a) The election not to recognize the gain realized upon the sale of qualified securities to the extent provided under section 1042(a) shall be made in a statement of election attached to the taxpayer's income tax

return filed on or before the due date (including extensions of time) for the taxable year in which the sale occurs. If a taxpayer does not make a timely election under this section to obtain section 1042(a) nonrecognition treatment with respect to the sale of qualified securities, it may not subsequently make an election on an amended return or otherwise. Also, an election once made is irrevocable.

(b) The statement of election shall provide that the taxpayer elects to treat the sale of securities as a sale of qualified securities under section 1042(a), and shall contain the following information:

(1) A description of the qualified securities sold, including the type and number of shares;

(2) The date of the sale of the qualified securities;

(3) The adjusted basis of the qualified securities;

(4) The amount realized upon the sale of the qualified securities;

(5) The identity of the employee stock ownership plan or eligible worker-owned cooperative to which the qualified securities were sold; and

(6) If the sale was part of a single, interrelated transaction under a prearranged agreement between taxpayers involving other sales of qualified securities, the names and taxpayer identification numbers of the other taxpayers under the agreement and the number of shares sold by the other taxpayers. See Q&A-2 of this section.

If the taxpayer has purchased qualified replacement property at the time of the election, the taxpayer must attach as part of the statement of election a statement of purchase describing the qualified replacement property, the date of the purchase, and the cost of the property, and declaring such property to be the qualified replacement property with respect to the sale of qualified securities. . . .

(c) If the taxpayer has not purchased qualified replacement property at the time of the filing of the statement of election, a timely election under this Q&A shall not be considered to have been made unless the taxpayer attaches the notarized statement of purchase described above to the taxpayer's income tax return filed

for the taxable year following the year for which the election under section 1042(a) was made.

III. *Validity of Petitioners' Section 1042 Elections*

Respondent contends that petitioners made timely, valid, and binding elections on their respective returns for 2002 to defer recognition under section 1042 of the realized gains from the ESOP stock sales, citing the following undisputed facts: (1) petitioners filed statements of election and statements of consent for 2002; (2) petitioners purchased FRNs during the replacement period in order to satisfy the section 1042 QRP requirement; (3) petitioners filed statements of purchase for 2003 describing the QRP they had purchased (i.e., the FRNs); and (4) petitioners received principal payments on the promissory notes in 2003 and 2004 but, consistent with section 1042 deferral, did not report any portion of those payments as income for those years.

Petitioners, seeking to avoid the possible consequences of a section 1042 election where their QRP has been deemed sold in the year it was acquired, now challenge the validity and irrevocable nature of the section 1042 elections they reported on their 2002 and 2003 returns. First, they argue that they sold their ESOP stock before E.M. Lawrence's S election was terminated and that, consequently, the shares of ESOP stock were not "qualified securities" for purposes of section 1042. *See* § 1042(c)(1) (defining the term "qualified securities" to mean certain securities "issued by a domestic C corporation"). Second, petitioners argue that, assuming they made section 1042 elections, they are entitled to revoke them on the ground that the elections were based on material mistakes of fact.

We first address petitioners' challenges to the validity and irrevocable nature of the section 1042 elections reported on their returns. Only if petitioners made valid, irrevocable section 1042 elections are we required to address petitioners' claim that they are entitled to report gain from the ESOP stock sales under the installment method notwithstanding their section 1042 elections with respect to those sales.

A. *E.M. Lawrence's S Election Revocation*

Petitioners' first argument is that E.M. Lawrence was still an S corporation at the time of the ESOP stock sales and that, consequently, the shares of ESOP stock were not "qualified securities"

within the meaning of section 1042(c)(1). Petitioners assert that the ESOP stock sales closed on the morning of November 8, 2002, and that later that same day E.M. Lawrence filed a Certificate of Amendment with the State of New Jersey, registering a second class of stock, thereby terminating the corporation's S election by virtue of its ceasing to qualify as a small business corporation. *See* § 1361(b)(1) (defining "small business corporation" to mean, inter alia, a domestic corporation with no more than one class of stock); § 1362(d)(2) (providing that an S election terminates whenever a corporation ceases to be a small business corporation). Petitioners argue that their representative's subsequent mailing of E.M. Lawrence's voluntary revocation of its S election on or after November 13, 2002, wherein the corporation requested that its S election be retroactively revoked, effective September 1, 2002, was therefore invalid and ineffective because at the time of the mailing E.M. Lawrence did not have the consent of 50% of its then shareholders. *See* § 1362(d)(1)(B) (providing that shareholders holding more than one-half of the shares must consent to revocation). On this basis, petitioners argue that the ESOP stock sales were ineligible for section 1042 tax treatment because E.M. Lawrence was an S corporation at the time of the sales.

Respondent argues that petitioners are precluded by the duty of consistency from arguing that the voluntary revocation of E.M. Lawrence's S election was not effective September 1, 2002, and that the election instead terminated on November 8, 2002. We agree.[22]

---

[22] While we agree with respondent that petitioners are precluded by the duty of consistency from challenging the validity of the September 1, 2002, voluntary revocation, we nevertheless note that petitioners' argument that E.M. Lawrence was an S corporation at the time of the ESOP stock sales by virtue of a termination rather than a voluntary revocation—even if we were to accept the disputed facts underlying it—relies on an incorrect interpretation of the relevant Internal Revenue Code provisions and regulations. Section 1362(d)(2)(B) provides that the termination of an S election by virtue of a corporation's ceasing to be a small business corporation is effective "on and after the date of cessation." If a termination takes effect on a date other than the first day of the corporation's taxable year (in this case September 1, 2002), the corporation's taxable year—that is, the "S termination year,"—is split into two parts: the "S short year" and the "C short year." *See* § 1362(e). The "S short year" is "[t]he portion of such year ending before the 1st day for which the termination is effective." § 1362(e)(1)(A). The regulations further clarify: "The portion of the S termination year ending at the close of the day prior to the termination is treated as a short taxable year for which the corporation is an S corporation (the *S short year*)." Treas. Reg. § 1.1362-3(a). Thus, even if we accepted the facts underlying petitioners' claimed termination scenario, E.M. Lawrence would have ceased to be an S corporation after November 7, 2002.

The duty of consistency, or quasi-estoppel, is an equitable doctrine that prevents a taxpayer from taking one position on one tax return and a contrary position on a subsequent return after the limitations period has run for the earlier year, if the contrary position would harm the Commissioner. *See Cluck v. Commissioner*, 105 T.C. 324, 331 (1995); *LeFever v. Commissioner*, 103 T.C. 525, 541–42 (1994), *aff'd*, 100 F.3d 778 (10th Cir. 1996); *Baldwin v. Commissioner*, T.C. Memo. 2002-162, 83 T.C.M. (CCH) 1915, 1927–28 (applying duty of consistency to hold taxpayer estopped from claiming that his wholly owned corporation was not valid S corporation). The duty of consistency applies when (1) the taxpayer has made a representation or reported an item for tax purposes in one year, (2) the Commissioner has acquiesced in or relied on that act for that year, and (3) the taxpayer desires to change the representation, previously made, in a later year after the statute of limitations on assessments bars adjustments for the initial year. *Cluck*, 105 T.C. at 332; *LeFever*, 103 T.C. at 543; *see also Janis v. Commissioner*, 461 F.3d 1080, 1085 (9th Cir. 2006), *aff'g* T.C. Memo. 2004-117; *Eagan v. United States*, 80 F.3d 13, 17 (1st Cir. 1996); *Kielmar v. Commissioner*, 884 F.2d 959, 965 (7th Cir. 1989), *aff'g Glass v. Commissioner*, 87 T.C. 1087 (1986); *Herrington v. Commissioner*, 854 F.2d 755, 758 (5th Cir. 1988), *aff'g Glass v. Commissioner*, 87 T.C. 1087 (1986); *Shook v. United States*, 713 F.2d 662, 667 (11th Cir. 1983); *Beltzer v. United States*, 495 F.2d 211, 212 (8th Cir. 1974); *Hess v. United States*, 210 Ct. Cl. 483, 495 (1976). The duty of consistency is an affirmative defense, and the Commissioner therefore bears the burden of proving that it applies. *See* Rule 142(a).

Respondent has carried his burden in demonstrating that each of the elements of the duty of consistency is present. First, from November 13, 2002, until they supplemented their Motions for Partial Summary Judgment, *see supra* note 5,[23] petitioners consistently represented that E.M. Lawrence's S election was revoked effective September 1, 2002, and that consequently E.M. Lawrence was a C corporation at the time of the ESOP stock sales. This includes the representations made in the letter dated November 7, 2002, requesting the revocation of E.M. Lawrence's S election effective September 1, 2002, and the representations made on petitioners' 2002 returns wherein they reported an election under section 1042(a) to defer

---

[23] Petitioners took the position for the first time in their First Supplement to their Motion for Partial Summary Judgment that E.M. Lawrence's S election was terminated after the ESOP stock sales rather than voluntarily revoked by them effective September 1, 2002.

recognition of the realized gain from those sales and identified the shares of ESOP stock as "qualified securities" within the meaning of section 1042(c)(1). Second, respondent relied on petitioners' representations to his detriment by accepting their 2002 returns as filed and not auditing them. Had respondent been aware that petitioners' actual position was that E.M. Lawrence remained an S corporation through November 8, 2002, he could have challenged petitioners' section 1042 elections for 2002 and investigated whether they had properly reported passthrough income as S corporation shareholders for the period September 1–November 8, 2002. He is foreclosed from doing either now because the period of limitations has expired.

On these facts, we hold that the duty of consistency applies and that petitioners are estopped from claiming that E.M. Lawrence was not a domestic C corporation at the time of the ESOP stock sales. *See Baldwin*, 83 T.C.M. (CCH) at 1928.

### B. *Possible Revocation of the Reported 1042 Elections*

Petitioners' second argument is that, even if they made valid section 1042 elections, they should be allowed to revoke them on the ground that the elections were based on material mistakes of fact. *See Meyer's Estate v. Commissioner*, 200 F.2d 592 (5th Cir. 1952), *rev'g* 15 T.C. 850 (1950). In support of this argument, petitioners allege that they "were mistaken about the value" of the promissory notes and that they "were fraudulently induced to make the I.R.C. § 1042 election based upon misrepresentations by their attorneys . . . and by their investment advisors." Respondent argues that their election to use section 1042 is irrevocable, and we agree.

The regulations under section 1042 provide that an election to defer gain under that section is irrevocable, Temp. Treas. Reg. § 1.1042-1T, Q&A-3(a), and this position is buttressed by the doctrine of election, which holds generally that an election by a taxpayer that is a free choice between alternative, legally valid tax treatments and is communicated to the Commissioner by an overt act is irrevocable, *see Grynberg v. Commissioner*, 83 T.C. 255, 261 (1984); *Hodel v Commissioner*, T.C. Memo. 1996-348, 72 T.C.M. (CCH) 276, 279 (1996). *See generally Pac. Nat'l Co. v. Welch*, 304 U.S. 191 (1938). The doctrine's requirement of a free choice is satisfied where a taxpayer elects a specialized method to account for an item. *See Keeler v. Commissioner*, 180 F.2d 707 (10th Cir. 1950) (taxpayer's election of a war loss deduction under section 127 of Internal Revenue Code of 1939 not revocable under doctrine of election),

*aff'g* 12 T.C. 713 (1949). "Under the doctrine of election, a taxpayer who makes a conscious election may not, without the consent of the Commissioner, revoke or amend it merely because events do not unfold as planned." *United States v. Helmsley*, 941 F.2d 71, 86 (2d Cir. 1991).

Petitioners had a free choice to elect section 1042 treatment with respect to the gain from their ESOP stock sales. Petitioners gave unequivocal notice of that choice to respondent by filing statements of election and statements of consent with their 2002 returns. Those statements tracked each of the essential requirements for the time and manner of making section 1042 elections set forth in the regulations. Notice to respondent of their choice of section 1042 was further buttressed by their filing statements of purchase with their 2003 returns describing the QRP they had purchased. Consequently, petitioners' section 1042 elections are irrevocable.

Some courts, however, have held that a taxpayer may abandon an otherwise irrevocable election if it was based upon a "material mistake of fact." *Meyer's Estate v. Commissioner*, 200 F.2d at 597.[24] As noted, petitioners contend that they were mistaken about the value of the promissory notes and further claim that they were "fraudulently induced" to make the section 1042 election. Assuming as we must for purposes of summary judgment that petitioners were mistaken about the value of the promissory notes, that mistake of fact is readily distinguishable from the one in *Meyer's Estate*. The mistake of fact at issue in *Meyer's Estate* was an erroneous earned surplus figure being carried on the books of the corporation on which the taxpayers relied in good faith in making an election (under section 112(b)(7) of the Internal Revenue Code of 1939) to have their gains on a corporate liquidation taxed as ordinary income to the extent of the corporation's earned surplus.

---

[24] This Court has not adopted the reasoning of *Meyer's Estate*, but under *Golsen v. Commissioner*, 54 T.C. 742, 756–57 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971), we follow it in the case at Docket No. 388-13 because appeal lies, absent a stipulation to the contrary, with the U.S. Court of Appeals for the Eleventh Circuit, where it is binding precedent. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (holding that U.S. Court of Appeals for the Eleventh Circuit follows precedent of cases decided by the U.S. Court of Appeals for the Fifth Circuit before September 30, 1981). Because, as discussed more fully hereinafter, we find that petitioners' cases are distinguishable from *Meyer's Estate*, we have no occasion to consider whether we should follow that decision in the case at Docket No. 202-13, which absent a stipulation to the contrary is appealable to the U.S. Court of Appeals for the Second Circuit, which does not appear to have considered this aspect of *Meyer's Estate*.

No comparable scenario exists here. The apparent inability of E.M. Lawrence to meet its obligations under the promissory notes in later years is just the kind of subsequent development that does not provide grounds for revoking an election. *See Estate of Stamos v. Commissioner*, 55 T.C. 468 (1970) (stating taxpayer could not revoke election to capitalize interest and tax payments on real property upon later disallowance of a capital loss carryforward to the year for which capitalization election had been taken); *see also Branum v. Commissioner*, 17 F.3d 805, 808 (5th Cir. 1994), *aff'g* T.C. Memo. 1993-8; *Johnson v. Commissioner*, 989 F.2d 484, 1993 WL 93132, at *5 (1st Cir. 1993) (unpublished table decision), *aff'g* T.C. Memo. 1991-645; *Grynberg*, 83 T.C. at 262; *Cohen v. Commissioner*, 63 T.C. 527, 533 (1975), *aff'd*, 532 F.2d 745 (3d Cir. 1976) (unpublished table decision); *Hodel*, 72 T.C.M. (CCH) at 280; *Blakely v. Commissioner*, T.C. Memo. 1982-745, 45 T.C.M. (CCH) 437, 439 (1982) ("Unexpected subsequent events and a later change of mind will not be grounds for relief from the binding effect of an election."), *aff'd per curiam*, 720 F.2d 411 (5th Cir. 1983).

Petitioners' second allegation is that they were "fraudulently induced" by their attorneys and investment advisors into making the section 1042 elections. It is well established that "good faith reliance on a mistaken legal judgment about the tax consequence of an improvident election does not entitle the taxpayer to revoke the election." *Bankers & Farmers Life Ins. Co. v. United States*, 643 F.2d 234, 238 (5th Cir. 1981) (holding taxpayer not entitled to revoke an election based on a mistake of law). Again, assuming, as we must, that petitioners were "fraudulently induced" by their advisors to make the section 1042 elections, such misrepresentations would not have been mistakes of fact, but rather mistakes as to the legal consequences of engaging in the Derivium 90% loan transactions. *See Johnson v. Commissioner*, 1993 WL 93132, at *5; *Cohen*, 63 T.C. at 532–33; *Hemmings v. Commissioner*, T.C. Memo. 1997-121, 73 T.C.M. (CCH) 2266, 2274–75.[25] Thus, even if

---

[25] As the U.S. Court of Appeals for the First Circuit notes, a mistake of fact occurs "in instances where either (1) the facts exist, but are unknown, or (2) the facts do not exist as they are believed to." *Johnson v. Commissioner*, 1993 WL 93132, at *5 (quoting *Hambro Auto. Corp. v. United States*, 603 F.2d 850, 855 (C.C.P.A. 1979)). A mistake of law, however, "occurs where the facts are known, but their legal consequences are not known or are believed to be different than they really are." *Id.* (quoting *Hambro Auto. Corp.*, 603 F.2d at 855). Petitioners do not dispute that they in fact sold the Gillette and UPS FRNs. Therefore, the 90% loan transactions were not factual shams.

petitioners were misled by their advisors, they would not be entitled to revoke their section 1042 election under applicable caselaw.

C.   *Conclusion*

In view of the foregoing, we hold that petitioners each made valid and binding section 1042 elections on their 2002 returns with respect to the ESOP stock sales.  Consequently, we must address whether those elections foreclose application of the installment method in determining the timing and amount of gain that must be recognized from those sales.

IV.   *Interplay of Sections 1042 and 453*

We now consider whether petitioners are entitled to recognize the gains recaptured under section 1042(e) on account of the sales of their QRP under the installment method.

Respondent argues that petitioners validly elected to defer the gains realized from their ESOP stock sales under section 1042 on their 2002 returns and as a consequence all of those gains were deferred under section 1042, leaving no gain upon which section 453 could operate. "Thus," respondent argues, "whether petitioners elected out of section 453 is not relevant to" the gains that must be recognized pursuant to section 1042(e) upon the disposition of the QRP in 2003. Instead, section 1042(e), which directs that, upon disposition of any QRP,  gain "shall be recognized to the extent of the gain which was not recognized . . . by reason of the acquisition . . . of such" QRP, provides the exclusive means for recognizing gain in these circumstances. Section 1042(e) is the exclusive means for determining such gain, respondent further argues, because the provision directs that its terms so operate "*notwithstanding any other provision of this title*"—i.e., Title 26, the Internal Revenue Code.  (Emphasis added.)

Respondent's argument that a section 1042 election supplants section 453 ignores the plain text of section 453.  Section 453 provides that "[e]*xcept as otherwise provided in this section*, income from an installment sale shall be taken into account *for purposes of this title* under the installment method."  § 453(a) (emphasis added).  The command of section 453(a) that income from an installment sale be taken into account under the installment method is as sweeping as the

command of section 1042(e) that gain upon the disposition of QRP be computed and recognized pursuant to its terms.[26]

Petitioners' sales of their ESOP stock were installment sales because at least one payment for the stock was to be received after the close of the taxable year in which the sale occurred. *See* § 453(b)(1). Thus section 453 presumptively applies unless petitioners elected not to have it apply. *See* § 453(d). There is no evidence they did so, and respondent does not contend otherwise.[27] Petitioners also reported on their 2002 returns that they were making elections under section 1042 to defer the gains on their sales of the ESOP stock (and complied with all requirements for making an election). Thus, the transactions at issue are simultaneously subject to both statutory regimes. Because petitioners disposed of all their QRP in 2003, respondent argues that section 1042(e) requires them to recognize the entire $4,122,572 gain realized for 2002 ($4,150,000 sale price less basis of $27,428),[28] notwithstanding the fact that petitioners each received only $449,277 in payment for their ESOP stock in 2003 and in total received only

---

[26] In a recent opinion we observed that "[i]n statutes, the word ['notwithstanding'] 'shows which provision prevails in the event of a clash.'" *Liberty Global, Inc. v. Commissioner*, No. 341-21, 161 T.C., slip op. at 17 (Nov. 8, 2023) (second alteration in original) (quoting *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 301 (2017)). But, as we explain below, there is no "clash" here, so the provision does not help respondent.

[27] Respondent's position is that whether petitioners elected out of section 453 is irrelevant because the election of section 1042 removes any gain from the sale of their ESOP stock from the purview of section 453. We disagree. The statute provides that an election out of section 453 shall be made in the manner prescribed by regulations. The only means for electing out of section 453 provided in the regulations is for the taxpayer to report on his return for the year of sale an amount realized equal to the selling price including the full face amount of any installment obligation. Temp. Treas. Reg. § 15a.453-1(d)(3). While petitioners reported on their statements of election—in compliance with Temporary Treasury Regulation § 1.1042-1T, Q&A-3—the amounts realized upon the sales of their ESOP stock, respondent has not contended that this reporting should be construed as constituting an election out of section 453 within the terms of Temporary Treasury Regulation § 15a.453-1(d)(3). Moreover, in view of Congress's clearly expressed intent that an election out of section 453 should entail reporting the amount realized *as includible in gross income*, *see* S. Rep. No. 96-1000, at 12, 1980-2 C.B. at 500, petitioners' reporting of the amount realized on their section 1042 statements of election should not be construed as an election not to have section 453 apply.

[28] Respondent would also allow each petitioner to offset that gain by half of the $415,000 fee each paid to Bancroft in order to participate in the Derivium transaction. The remaining half of the fee is attributable to the transactions involving the Colgate Palmolive and Merck & Co. FRNs, the acquisition of which by petitioners is a disputed fact. *See supra* note 3.

$499,425 (Edward) and $499,061 (Annie) for the stock.[29],[30] Section 453, by contrast, would require petitioners to recognize gain limited to the gross profit proportion of each payment on their promissory notes, when received. Our task in such circumstances is to determine whether the two provisions may be reconciled. "Courts should make every effort to reconcile allegedly conflicting statutes and to give effect to the language and intent of both, so long as doing so does not deprive one or the other of its essential meaning." *Wilderness Soc'y v. Morton*, 479 F.2d 842, 881 (D.C. Cir. 1973).

A careful parsing of section 1042 reveals that it can be reconciled and harmonized with section 453. Section 1042(a) provides as follows:

> Sec. 1042(a). Nonrecognition of gain.—If—
>> (1) the taxpayer . . . elects in such form as the Secretary may prescribe the application of this section with respect to any sale of qualified securities,
>> (2) the taxpayer purchases qualified replacement property within the replacement period, and
>> (3) the requirements of subsection (b) are met with respect to such sale,
> then the gain (if any) on such sale *which would be recognized* as long-term capital gain shall be recognized only to the extent that the amount realized on such sale exceeds the cost to the taxpayer of such qualified replacement property.

(Emphasis added.) The use of the subjunctive phrasing concerning gain "which *would* be recognized" in the flush language of section 1042(a) invokes a supposition or condition.[31] The supposition being posited is:

---

[29] In 2004 Edward received an additional $50,148 payment on his promissory note and Annie received an additional $49,784 payment on hers. Neither received any further payments during the years at issue. The payments received on their promissory notes during the years at issue totaled $499,425 in Edward's case and $499,061 in Annie's.

[30] Because there is a factual dispute concerning petitioners' acquisition of half of the FRNs they reported on their 2003 returns as having been acquired in that year, *see supra* note 3, the parties seek summary judgment with respect to only half of the gains.

[31] *Webster's New World College Dictionary* (4th ed. 2010), defines "would" as, inter alia, "used to express a supposition or condition."

what gain would be recognized on the sale of the qualified securities in the absence of a section 1042 election?  Given that the enactment of this flush language in section 1042(a) followed by six years[32] the 1980 enactment of modern day section 453[33] (mandating installment method reporting for installment sale dispositions unless the taxpayer elects out), Congress is presumed to have been aware of the operation of section 453 when it enacted the flush language of section 1042.  *See St. Louis, I.M. & S. Ry. Co. v. United States*, 251 U.S. 198, 207 (1920) ("Congress must be presumed to have known of its former legislation . . . and to have passed the new laws in view of the provisions of the legislation already enacted."); *United States v. Zavala-Sustaita*, 214 F.3d 601, 606 n.8 (5th Cir. 2000) (stating Congress is "presumed to have knowledge of its previous legislation when making new laws" (quoting *Garcia v. United States*, 88 F.3d 318, 334 (5th Cir. 1996) (Garza, J. concurring))); *Owner-Operators Indep. Drivers Ass'n of Am. v. Skinner*, 931 F.2d 582, 586 (9th Cir. 1991).  Thus, Congress is presumed to have been aware that the gain "which would be recognized"—that is, the gain which would otherwise be recognized in the absence of section 1042— could depend upon the operation of section 453 if the qualified securities had been sold pursuant to an installment sale.

When securities have been sold to an ESOP in an installment sale where no payment is received in the year of sale, then the gain that would be recognized for that year in the absence of a section 1042 election is zero, because that is the result under the installment method.  As petitioners sold their ESOP stock in 2002 in installment sales pursuant to which no payment was made in that year, their gain "which

---

[32] The flush language of section 1042(a) as originally enacted in 1984 read as follows: "then the gain (if any) on such sale shall be recognized only to the extent that the amount realized on such sale exceeds the cost to the taxpayer of such qualified replacement property."  Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 541(a), 98 Stat. 494, 887.  The amendment changing the phrase "shall be recognized" to the subjunctive phrase "which would be recognized as long-term capital gain" was made by the Tax Reform Act of 1986, Pub. L. No. 99-514, § 1854(a)(1)(A), 100 Stat. 2085, 2872.

[33] As noted *supra* p. 17, section 453 was substantially revised in 1980 to reverse the election required of a taxpayer disposing of property through an installment sale.  Before its amendment in 1980, section 453 required such a taxpayer to elect to use the installment method.  The 1980 amendment mandates use of the installment method for a taxpayer disposing of property through an installment sale *unless* the taxpayer affirmatively elects not to have the installment method apply.

would be recognized as long-term capital gain" for that year if no section 1042 election had been made is zero.

In 2003 petitioners each received $449,277 principal payments on their promissory notes that neither reported on the 2003 return, taking the position that they need not recognize the gains triggered by the installment payments by virtue of having purchased QRP (the FRNs) at a cost equal to the amounts of the entire gains realized on the sales of their ESOP stock.[34] Since petitioners had not elected out of the application of section 453, their receipt of installment payments in 2003 triggered recognition of gain equal to "that proportion of the payments received in that year which the gross profit (realized or to be realized when payment is completed) bears to the total contract price." § 453(c). The contract price each petitioner received for the ESOP stock was $4,150,000 and the basis was $27,428. Thus, each realized a gross profit on the sale of $4,122,572 ($4,150,000 contract price less $27,428 basis). The ratio of the gross profit to the contract price is 99%. Pursuant to the installment method, they were required to recognize $444,784 of gain for 2003 (99% of the $449,277 payment). The gain "which would be recognized" for 2003 in the absence of a section 1042 election is thus $444,784. But petitioners having elected section 1042 and reported the purchase of QRP at a cost ($4,150,000) exceeding the amount realized on the sale of the ESOP stock ($4,122,572), section 1042(a) operates—at least initially before petitioners' sales of the QRP—to defer any recognition of the $444,784 of gain "which would be recognized" under the installment method for 2003.

As a consequence of this deferral, a corresponding adjustment to the basis of the QRP is required. That is, the basis must be reduced "by the amount of gain not recognized by reason of" the purchase of the QRP and the application of section 1042(a); namely, $444,784. § 1042(d). The QRP was reported as purchased in 2003 at a cost of $4,150,000, giving it an initial basis equal to that amount. Accordingly, the QRP's $4,150,000 basis must be reduced by $444,784 to $3,705,216 pursuant to section 1042(d).

---

[34] We note in this regard that petitioners' failures to report gains consistent with the installment method on their 2003 returns have no impact on the applicability of the installment method for reporting the gain on the sale of their ESOP stock pursuant to installment sales. Installment method reporting remained the correct means for reporting their gains realized on the installment sales of their ESOP stock, notwithstanding their erroneous reporting on their 2003 returns. *See Bolton*, 92 T.C. at 304–05.

Finally, when petitioners disposed of their QRP (i.e., the FRNs) in 2003 (by virtue of the deemed sales to Bancroft), they each received proceeds of $3,735,000 (the $4,150,000 face value of the FRNs less Bancroft's $415,000 fee). As each petitioner had an adjusted basis in the FRNs of $3,705,216, each had a gain of $29,784 on the deemed sale.[35]

In 2004 Edward and Annie received further principal payments on their promissory notes of $50,148 and $49,784, respectively. Since each disposed of all of their QRP in 2003, their section 1042 elections can no longer operate to defer any gain. They remain under the installment method,[36] however, under which their receipt of an installment payment triggers gain equal to the 99% gross profit percentage of each payment: for Edward, 99% of $50,148, or $49,647 of recognized gain; and for Annie, 99% of $49,784, or $49,286 of recognized gain.

As there were no principal payments to petitioners in 2005 through 2008, no gains from their ESOP sales are recognized for those years, consistent with the installment method, under which recognition of gain depends upon receipt of an installment payment for the year.

To reflect the foregoing,

*An order will be issued granting petitioners' Motion for Partial Summary Judgment and denying respondent's Motion for Partial Summary Judgment.*

---

[35] For simplicity and ease of comprehension we analyze the acquisition and disposition of the FRNs as if petitioners were not now disputing their acquisition of the Colgate Palmolive and Merck & Co. FRNs. However, we will render summary judgment only with respect to the gain that must be recognized as a consequence of petitioners' acquisition and disposition of the Gilette and UPS FRNs. If it is ultimately determined that petitioners in fact acquired the Colgate Palmolive and Merck & Co. FRNs (as they reported on their 2003 returns), the same analysis would apply.

[36] As noted, petitioners' failure to report any gains for 2004 from the sales of their ESOP does not affect the applicability of the installment method to them. *See supra* note 34.